*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 08a0085p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

―――――――――――

RICHARD L. TAYLOR,

*Plaintiff-Appellee,*

No. 07-5255

*v.*

TECO BARGE LINE, INC.,

*Defendant-Appellant.*

>

Appeal from the United States District Court
for the Western District of Kentucky at Paducah.
No. 04-00033—Thomas B. Russell, District Judge.

Argued: December 4, 2007

Decided and Filed: February 20, 2008

Before: GUY, MOORE, and GILMAN, Circuit Judges.

―――――――――――

**COUNSEL**

―――――――――――

**ARGUED:** Ronald E. Fox, FOX GALVIN, St. Louis, Missouri, for Appellant. Brian S. Katz, BLOOMFIELD & KATZ, Paducah, Kentucky, for Appellee. **ON BRIEF:** Ronald E. Fox, Greg J. Erickson, FOX GALVIN, St. Louis, Missouri, for Appellant. Brian S. Katz, BLOOMFIELD & KATZ, Paducah, Kentucky, L. Jeff Bloomfield, BLOOMFIELD & KATZ, Memphis, Tennessee, for Appellee.

―――――――――――

**OPINION**

―――――――――――

KAREN NELSON MOORE, Circuit Judge. Plaintiff Richard Taylor ("Taylor"), formerly a deckhand on the M/V Ann Peters for TECO Barge Line, Inc. ("TECO"), sued his former employer for damages, claiming exposure to coal tar left him with a permanent, severe skin reaction. After a jury awarded Taylor one million dollars, TECO brought this appeal. On appeal, TECO asserts that the district court made three evidentiary errors, erred in denying its motion for a judgment as a matter of law, and erred in refusing to offer a jury instruction on the harmlessness of the chemical in question. Additionally, TECO argues that the jury verdict was excessive. For the following reasons, we **AFFIRM** the district court's judgment.

1

# I. BACKGROUND

## A. Factual Background

Taylor began working for TECO in October 2000, and at that time he had no history of skin trouble. When he started at TECO, Taylor was assigned to the M/V Ann Peters as an inexperienced deckhand. According to Taylor, at some point in late 2000 or early 2001, as part of his deckhand duties, he was instructed to enter the potable water tank and sweep the walls and floor. At trial, Taylor testified that he was given no protective equipment in order to perform this task. When he emerged from the tank, he was covered with dust and noticed that he had developed "a sunburn type rash" on his skin. Joint Appendix ("J.A.") at 507 (Aug. 15, 2006, Trial Tr., Taylor Test. at 52:10-15).

Over the next several months, Taylor's rash continued to develop. The rash would get better when he disembarked from the ship and would worsen when he returned. As time passed, the rash began to spread up his hands to his arms. On March 26, 2001, Taylor requested medical attention for the rash, which by now had advanced up his right arm. Doctor J.H. Simpson twice evaluated Taylor during this period of time and diagnosed Taylor with contact dermatitis. While sailing on November 3, 2001, the rash worsened, and Taylor again sought medical attention. Taylor thus began a long history of medical consultation and treatment. *See* J.A. at 186-249 (records of various medical consultations and treatments between 2001 and 2004). Despite medical attention, Taylor's rash continued to worsen; according to Taylor, "it got to a point where my skin wouldn't get better when I got home." J.A. at 511 (Taylor at 66:22-23).

In 2003, TECO directed Taylor to return to the water tank. According to Taylor, he and three other crewmen were instructed to enter the tank and remove all of the material coating the tank. In order to do their work, the crewmen were each fitted for a full face mask and a respirator, but Taylor testified that they were provided with only a smaller face mask, safety glasses, and a Tyvek paper suit. The crewmen's work made the tank extremely dusty, a circumstance exacerbated by the use of a fan that blew air into the tank. According to Taylor, it was so dusty that it was difficult for the crewmen to see. When Taylor emerged from the tank, he was covered in black dust, including a coating of dust over his exposed skin; Taylor once again developed a sunburn-type reaction. Taylor was not the only employee to react to the substance; two of the other deckhands cleaning the tank also suffered chemical burns. David Duane Dubrock ("Dubrock"), TECO's safety manager, told Taylor and the other deckhands that he suspected that the tank was coated with a substance called Bitumastic. Bitumastic is a sealant that contains coal tar, and coal tar is a known carcinogen that can sensitize skin.

After visiting numerous other doctors, in February 2004, Taylor began to see Dr. Artis Truett III ("Dr. Truett"). A test on March 29, 2004, revealed that Taylor had developed an allergy to coal tar. As Dr. Truett testified in his deposition, which was admitted at trial: "I tested him to coal tar, which is suppose [sic] to cross-react with Bitumastic. So, yes, I think he was allergic to the Bitumastic 300 and that caused him to break out in an itchy rash." J.A. at 1197-98 (Dec. 28, 2005, Dr. Artis Truett Depo. at 41:24-42:42). After trying various topical ointments, in January 2006, Dr. Truett prescribed phototherapy for Taylor. Taylor received at least thirty-five phototherapy treatments, which were reportedly helping to reduce his rash.

**B.  Procedural Background**

Taylor sued TECO on February 10, 2004, and amended the complaint on March 9, 2004. He raised claims under both the Jones Act, 46 U.S.C. § 688 *et seq.*,[1] and general maritime law.  The complaint alleged that TECO was negligent in exposing him to Bitumastic and that the ship was unseaworthy because of the presence of Bitumastic.

On June 14, 2006, TECO filed a motion in limine to exclude from evidence any Material Data Safety Sheets ("MSDS or data sheets")[2] regarding Bitumastic that were dated after 1990. TECO argued that it purchased the ship in 1990, and because the prior owners had applied the Bitumastic to the M/V Ann Peters's tank, the Bitumastic used may have been an older formulation. TECO also claimed that the data sheets apply only to the application of Bitumastic, not its removal, so the MSDS are irrelevant to Taylor's case.  On August 4, 2006, the district court denied TECO's motion.  The district court stated that the "Plaintiff correctly notes that the Material Safety Data Sheet (MSDS) is relevant to the safe removal of Bitumastic."  J.A. at 125 (Aug. 4, 2006, Order).

On August 15, 2006, the trial began.  Just prior to voir dire, TECO sought to exclude photographs of Taylor's skin condition that Taylor took in March 2006, which were provided to TECO only the week before trial.  TECO claimed that it received the photographs too late for them to be admissible.  Specifically, TECO argued that admitting the photographs would be prejudicial because TECO did not have the opportunity to use the photos during the already-recorded deposition of Dr. Truett.  The district court concluded that the photos were not prejudicial and admitted them over TECO's objection.

At the close of Taylor's case, TECO asked for a judgment as a matter of law, which the district court promptly denied.

On August 18, 2006, the jury found TECO liable under both the Jones Act and general maritime law for unseaworthiness.  The jury awarded Taylor one million dollars.  The district court discounted the award to present value and awarded Taylor $817,914.  TECO renewed its motion for a judgment as a matter of law and additionally requested a new trial or remittitur.  The district court denied the motions, and TECO filed this timely appeal.

## II.  DISCUSSION

**A.  Evidentiary Issues**

**1.  Standard of Review**

"This court reviews a district court's evidentiary rulings for abuse of discretion, and a district court's determination will be reversed only if the abuse of discretion caused more than harmless error."  *Tompkin v. Philip Morris USA, Inc.*, 362 F.3d 882, 897 (6th Cir. 2004); *see also Maday v. Pub. Libraries of Saginaw*, 480 F.3d 815, 819 (6th Cir. 2007); *Tisdale v. Fed. Express Corp.*, 415 F.3d 516, 527 (6th Cir. 2005).  "Even if a mistake has been made regarding the admission or

---

[1] The Jones Act was repealed on October 6, 2006.  Pub. L. 109-304, § 19, 120 Stat. 1485, 1711 (2006).  The repeal, however, does not apply to "duties that matured, penalties that were incurred, or proceedings that were begun before the date of enactment of this Act . . . ."  § 19, 120 Stat. at 1710.  Taylor commenced his action in 2004. Furthermore, Congress added language nearly identical to the Jones Act at 46 U.S.C. § 30104 *et seq.*

[2] The MSDS are documents that provide data on the components of a chemical substance, the components' proportions within the substance, and instructions for safe use of the substance.

exclusion of evidence, a new trial will not be granted unless the evidence would have caused a different outcome at trial." *Morales v. Am. Honda Motor Co.*, 151 F.3d 500, 514 (6th Cir. 1998).

"A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed." FED. R. CIV. P. 37(c)(1).[3]  But inadvertent and small mistakes are excused. *See* FED. R. CIV. P. 37(c)(1), 1993 Amendments, cmt. Subdivision (c). "In particular, this court has held that where a judge has determined that testimony is otherwise admissible, the mere fact that the party seeking its introduction has not fully complied with pretrial orders does not mandate its exclusion . . . ." *Miller v. Am. President Lines, Ltd.*, 989 F.2d 1450, 1466 (6th Cir.), *cert. denied*, 510 U.S. 915 (1993).

### 2. Admission of Photographs

On appeal, TECO asserts that the district court made three evidentiary errors.  The first alleged error is the district court's admission into evidence of the March 2006 photographs that Taylor took of his skin.  According to TECO, Taylor's disclosure of these photographs so soon before trial made them inadmissible.

When considering TECO's motions for a judgment as a matter of law or a new trial, the district court justified the decision to admit the photos: "while the photographs may be harmful to Teco, the photographs still provided an accurate description of Taylor's skin condition at that time, and therefore, were not overly prejudicial." J.A. at 36 (Jan. 25, 2007, Mem. Op. at 3).  In addition, the district court stressed that "[a]t trial, Teco had ample opportunity to show the photographs [to] the Plaintiff's expert, and question him about them.  In addition, Teco could have questioned its own expert about the photographs; however, Teco chose not to do so." *Id.*  Although it is not clear to us that TECO had the opportunity to question Taylor's witness, Dr. Truett, regarding the photographs, we conclude that it was not an abuse of discretion to admit the photographs.  Furthermore, even if the district court did err in admitting the photographs, the error did not influence the outcome of the trial.

First, as the district court noted, the photographs were relevant and Taylor deserved the opportunity to present an accurate depiction of his condition.  Furthermore, the challenged photographs were not the only images admitted into evidence; during trial, Taylor introduced pictures from September 2003, in addition to the contested photos from March 2006.  Although the photographs themselves are not in the record, the testimony suggests that both the uncontested 2003 photographs and the contested 2006 photographs document the inflamed condition of his skin on similar areas of his body.  *Compare* J.A. at 520 (Taylor at 101:17-103:1) (discussing the 2003 photographs) *with* J.A. at 521 (Taylor at 105:2-106:25) (discussing the 2006 photographs). Therefore, it is unlikely that admission of the 2006 photographs would have prejudiced TECO because TECO was already prepared to deal with the previously disclosed 2003 photographs.

Second, although we disagree with the district court that TECO had the opportunity to use the photographs to challenge Dr. Truett's testimony, we do not believe that the lack of opportunity to challenge Dr. Truett with the 2006 photographs prejudiced TECO.  Although the district court believed that TECO could have challenged Dr. Truett with the 2006 photographs, that would have been impossible given that Dr. Truett gave a deposition on July 18, 2006, before Taylor turned over

---

[3] On December 1, 2007, an amended version of Federal Rule of Civil Procedure 37(c)(1) went into effect.  The relevant portion reads: "Failure to Disclose or Supplement.  If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."

the photographs in August. That said, we believe that it is unlikely that presenting the 2006 photographs to Dr. Truett would have altered the outcome of the trial. TECO believes that the 2006 photographs contradicted Dr. Truett's testimony that phototherapy was helping Taylor, but Dr. Truett, as Taylor's treating physician, was well aware of Taylor's condition. In his deposition, Dr. Truett stated in no uncertain terms his thoughts on the phototherapy: "Well it's helped significantly." J.A. at 1324 (July 18, 2006, Dr. Artis Truett Depo. at 7:15-21). In addition, Dr. Truett's name appears on the phototherapy treatment forms, and Dr. Truett was in charge of adjusting the dosage for the treatment. Therefore, it seems unlikely that the March 2006 photographs would have altered Dr. Truett's testimony. In any event, TECO could have easily challenged Dr. Truett's conclusions regarding the effectiveness of phototherapy through its own witness, as we will discuss next. Thus, we conclude that presenting the 2006 photographs to Dr. Truett would not have altered the outcome of the trial.

Third, TECO claims that the photographs were prejudicial because its witness was not allowed to testify about the photographs. TECO, however, mischaracterizes the district court's ruling because the district court never barred TECO's expert from addressing the photographs. The district court ruled that TECO's witness could not testify about an OSHA regulation, but TECO's attorneys never asked about the photographs. It is entirely possible that the district court would have allowed TECO's expert to testify about the photographs had TECO's attorneys asked. Furthermore, TECO's expert was still able to express his doubts about the benefits of the phototherapy treatment:

> The difficulty is that when I saw Mr. Taylor today he doesn't show really a significant improvement. His hands look pretty much the way they looked to me when I saw him last summer, and he told me—I didn't ask him to take his clothes off, but he told that the rash on his arms and legs was pretty much the same as it always was.

J.A. at 809 (Aug. 18, 2006, Trial Tr., Dr. Jonas Kalnas Test. at 588:18-23). Thus, even without testimony regarding the 2006 photographs, which it may have been able to offer had it asked, TECO was still able to present expert opinion regarding the effectiveness of Taylor's treatment.

Fourth, TECO claims that had it used the photographs after they were admitted over TECO's objections, TECO would have waived its objections to the photographs. We conclude that this argument is lacking force. The Supreme Court has said that "[g]enerally, a party *introducing* evidence cannot complain on appeal that the evidence was erroneously admitted." *Ohler v. United States*, 529 U.S. 753, 755 (2000) (emphasis added). TECO did not seek to introduce the photographs because Taylor already introduced them; thus, this waiver doctrine would not have applied to TECO. Accordingly, this argument lacks merit.

Finally, we note that Federal Rule of Civil Procedure 37 did not require the district court to bar the admission of the 2006 photographs. Although Taylor provided the photographs after the discovery period, it was not an abuse of discretion for the district court to conclude that the omission was a small oversight, especially given that Taylor had previously disclosed other photographs documenting the condition of his skin over the same set of body parts.

For these reasons, we conclude that the district court did not abuse its discretion in admitting the 2006 photographs. Even if the admission of the photographs was error, the admission did not alter the outcome of the trial.

### 3. Admission of Material Safety Data Sheets

The second evidentiary error that TECO alleges is that the post-1990-Bitumastic MSDS are irrelevant and inadmissible because the Bitumastic aboard the Ann Peters was applied sometime

before 1990. Furthermore, TECO alleges that MSDS are relevant only for the application of Bitumastic, not its removal. We conclude that both of these arguments are without merit.

The post-1990 data sheets are relevant. Although only a pre-1990 MSDS would conclusively establish the chemical makeup of pre-1990 Bitumastic, in the absence of any pre-1990 MSDS, more recent data sheets are suggestive as to the content of pre-1990 Bitumastic. During the trial, Taylor introduced numerous data sheets for Bitumastic 300M Part A, and all of the data sheets were dated after 1990. All of the sheets noted that Bitumastic contained around 30% coal tar and warned that Bitumastic "[m]ay be harmful if absorbed through the skin. . . . May cause skin burns. May cause allergic skin reaction." *See, e.g.*, J.A. at 330-31 (Mar. 4, 1996, MSDS for Bitumastic 300M Part A at 2). The data sheets also stated that they "[r]ecommend impervious gloves, clothing and safety glasses with side shield or chemical goggles to avoid skin and eye contact. If material penetrates to skin, change gloves and clothing. Hypersensitive persons should wear gloves or use protective cream." *See, e.g.*, J.A. at 336 (Dec. 27, 2004, MSDS for Bitumastic 300M Part A at 3). Taylor also introduced data sheets for Bitumastic 300M Part B, and those sheets also contained warnings such as: "May cause skin reaction. May cause allergic skin reaction." *See, e.g.*, J.A. at 410 (Dec. 4, 2002, MSDS for Bitumastic 300M Part B at 2). The 300M Part B MSDS also suggested that users take the same precautions as were suggested in the Part A data sheets. The fact that all of the post-1990 sheets are almost identical suggests that Bitumastic has not changed very much since 1990, which makes the more recent data sheets probative as to the content of pre-1990 Bitumastic.

Furthermore, TECO's own safety manager, Dubrock, relied on an MSDS when Taylor and the other crewmen suffered burns. Although we do not know which data sheet Dubrock used, he testified that there was essentially no difference between the various sheets:

> Q.   You didn't think it was important whether it was this MSDS for Bitumastic or that MSDS for Bitumastic, because the risks are essentially the same?
> A.   They're similar; yes, sir.

J.A. at 744-45 (Aug. 15, 2006, Trial Tr., David Dubrock Test. at 373:24-374:2). This statement by one of TECO's own employees further underscores the relevance of any of the Bitumastic data sheets, even the post-1990 sheets.

Likewise, the argument that the MSDS are relevant only for the application of Bitumastic and not the removal is also unavailing. First, Dubrock relied on the MSDS for Bitumastic when two sailors were burned cleaning the water tank of a similar ship in 1997. Second, Dubrock used a MSDS to tell Taylor and the other injured crewmembers about Bitumastic after they were burned during removal of the substance. Thus, Dubrock clearly believed that the data sheets were relevant for more than just the application of Bitumastic; Dubrock even responded in the affirmative when asked if "the best available information as to the health hazards involved with the removal of the product are the material safety data sheets?" J.A. at 672 (Dubrock at 301:17-20).

Dubrock's belief that the data sheets are applicable to the removal of Bitumastic is shared by Carboline's (the manufacturer of Bitumastic) director of technical resources, Dwayne Meyer ("Meyer"). Meyer stated:

> There's no government requirement to have anything specific for the removal of coatings. So the best thing that we always tell people is to follow the guidelines that are kind of set forth on the material safety data sheet for the application because that's the worst-case scenario.

J.A. at 1019 (Nov. 3, 2005, Dwayne Meyer Depo. at 46:18-23).   In addition, a doctor of environmental toxicology, Doctor Kenneth Mark Rudo ("Dr. Rudo"), testified that the chemicals that make a compound dangerous during its application often remain until its removal:

> Well, there's—there's most certainly going to be vapors and volatiles that can come off once you start chipping away, and you're banging at it and you're breaking it up and it's getting in the air and the dust is getting in the air, and, you know, it's a confined space, and it might be hot in there, you know, you're going to have—you know, these chemicals are volatile.

J.A. at 583 (Aug. 14, 2006, Trial Tr., Dr. Mark Rudo Test. at 212:1-7).

For these reasons, we conclude that the district court did not abuse its discretion when it admitted the data sheets.

### 4.  Denial of Expert Testimony on OSHA regulations

The third and final alleged evidentiary error involves testimony regarding applicable OSHA standards.  After Taylor's expert discussed OSHA's confined-entry standards, which TECO argues were inapplicable standards, TECO wanted its expert, Dr. Kalnas, to testify about the correct OSHA standard.  The district court responded that "[i]f he hasn't provided that opinion before that's nothing that you were caught off guard on.  And you've known that for a long time.  He can't give that opinion tomorrow.  I think that is prejudicial."  J.A. at 792 (Aug. 17, 2006, Trial Tr. at 522:13-17).  The district court also noted that TECO had advance notice that Taylor's expert was going to discuss the OSHA standard.  *See* J.A. at 792 (Aug. 17, 2006, Trial Tr. at 522:20-523:4).  Elaborating on its denial, the district court, in response to TECO's motion for a new trial, stated that "in both pre-trial reports written by Dr. Kalnas and filed by the Defendant, neither report addressed Dr. Kalnas' opinions on those matters.  The Defendant made its motion to have Dr. Kalnas address these matters mid-trial."  J.A. at 40 (Mem. Op. at 7).

The district court was correct that TECO had at least eight months of notice that Taylor was going to discuss OSHA's closed-entry standards.  For example, on January 6, 2006, Taylor filed his proposed jury instructions.  Proposed Instruction Number 20 would have instructed the jury on a possible violation of 29 C.F.R. § 1910.146, which is the provision dealing with confined-space-entry procedures.  Given the advance notice that TECO had, we cannot say that the district court abused its discretion when it barred TECO's witness from testifying on the OSHA regulation.

## B.  Denial of Motions for a Judgment as a Matter of Law and a New Trial

### 1.  Standard of Review

The Jones Act embodies a "policy of providing an expansive remedy for seamen who are injured while acting in the course of their employment."  *Rannals v. Diamond Jo Casino*, 265 F.3d 442, 447 (6th Cir. 2001) (internal quotation marks omitted), *cert. denied*, 534 U.S. 1132 (2002).  "Proof of negligence (duty and breach) is essential to recovery under the Jones Act."  *Perkins v. Am. Elec. Power Fuel Supply, Inc.*, 246 F.3d 593, 598 (6th Cir.), *cert. denied*, 534 U.S. 994 (2001).  In order to establish negligence, "a plaintiff must show that her employer failed to provide a safe workplace by neglecting to cure or eliminate obvious dangers of which the employer or its agents knew or should have known and that such failure caused the plaintiff's injuries and damages."  *Rannals*, 265 F.3d at 449.  The plaintiff must establish negligence, but "[o]nce a plaintiff proves an employer's negligence, however, she need only show that her 'employer's negligence is the cause, in whole or part, of [her] injuries.'"  *Id.* at 447 (quoting *Perkins*, 246 F.3d at 598).  "In essence, there is a reduced standard for causation between the employer's negligence and the employee's injury."  *Perkins*, 246 F.3d at 598.

Maritime law's unseaworthiness cause of action is a basis for liability independent from the Jones Act, but the two claims do have some overlap.

> A ship owner is strictly liable for personal injuries caused by his or her vessel's unseaworthiness. A vessel is unseaworthy if the vessel and its appurtenances are not reasonably fit for their intended use. Defective gear, an unfit or understaffed crew, or the use of an improper method of storage or unloading cargo all render a vessel unseaworthy. Even the misuse of properly functioning equipment may render a vessel unseaworthy if the misuse occurs at the direction of a superior.

*Churchwell v. Bluegrass Marine, Inc.*, 444 F.3d 898, 904 (6th Cir. 2006) (internal quotation marks and citations omitted). "A vessel may be unseaworthy because it contains defective gear, is missing necessary gear, or because its crew is instructed to use unsafe work methods." *Id*. Thus, a ship can be unseaworthy for a lack of the proper safety equipment. *See Perkins*, 246 F.3d at 603. Although there is strict liability for unseaworthiness, it is not a duty to "furnish an accident-free ship." *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 550 (1960).

"This court reviews a district court's decision to deny a motion for a new trial for an abuse of discretion. . . . A court may set aside a verdict and grant a new trial when it is of the opinion that the verdict is against the clear weight of the evidence; however, new trials are not to be granted on the grounds that the verdict was against the weight of the evidence unless that verdict was unreasonable. Thus, if a reasonable juror could reach the challenged verdict, a new trial is improper." *Barnes v. Owens-Corning Fiberglas Corp.*, 201 F.3d 815, 820-821 (6th Cir. 2000) (internal quotation marks and citations omitted).

"We review a district court's denial of a renewed motion for judgment as a matter of law *de novo*. Judgment as a matter of law is appropriate when viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion in favor of the moving party." *Tisdale*, 415 F.3d at 527 (internal quotation marks and citations omitted); *Danielson v. City of Lorain*, 938 F.2d 681, 683 (6th Cir. 1991); *King v. Love*, 766 F.2d 962, 969 (6th Cir. 1985).

## 2. Sufficient Evidence to Support Jury Verdict

### a. The Form of Bitumastic

TECO claims that it deserved a judgment as a matter of law or a new trial because there was insufficient evidence to support a jury verdict. In support of this argument, TECO points toward two ways in which the evidence was insufficient. First, TECO claims that the evidence presented established that Bitumastic is not dangerous in its dried state.

As we have already discussed in the context of the admissibility of the MSDS, Dr. Rudo offered testimony that established that Bitumastic is indeed dangerous in the dried state. In addition to that testimony, there was additional testimony establishing that coal tar, the main ingredient in Bitumastic, is dangerous even in its dried state. For example, Dubrock stated that regardless of which Bitumastic product was used aboard TECO's ships, they all contain coal tar. Dr. Rudo testified that coal tar contains many chemicals: "But—but many of these chemicals, dozens of them are carcinogens, human carcinogens. Dozens of them are mutagens. Dozens of them are chemicals that can cause effects on the skin by sensitizing it." J.A. at 574 (Dr. Rudo at 203:10-13). He then added, "We know beyond a shadow of a doubt, there's no—I mean it says it in these sheets. It says it everywhere that people exposed to these chemicals that they can cause these kind of skin problems that—that, you know, from exposure. So it's sort of—this is sort of an absolute thing." J.A. at 575 (Dr. Rudo at 204:8-13). It is apparent that there is quite a bit of evidence contradicting TECO's assertion regarding Bitumastic's supposed safety in its dry form.

When we combine the apparent dangerousness of Bitumastic with testimony indicating that TECO suspected that there was Bitumastic in the tank before TECO ordered the 2003 cleaning, *see* J.A. at 689 (Dubrock at 318:8-18), there was sufficient evidence for a jury to conclude that TECO was negligent.

### b. The OSHA Regulation

Second, TECO claims that it deserved a new trial or a judgment as a matter of law because the evidence established that TECO complied with OSHA standards. At trial, Taylor presented testimony from Roger Wabeke ("Wabeke"), an industrial hygienist. Wabeke mentioned the confined-space-entry standard during his trial testimony, a standard that TECO claims is inapplicable; it was this testimony that led to TECO's claims regarding the district court's decision not to admit its expert's testimony, which we have already addressed. Although Wabeke initially mentioned the disputed confined-space-entry standard, when asked to name a specific regulation that TECO may have violated, Wabeke did not discuss the disputed standard; instead, Wabeke mentioned 29 C.F.R. § 1910.134, the standard for respiratory protection. According to Wabeke, the respiratory-protection regulation required TECO to provide to Taylor and the other crewmen entering the water tank "level A personal protective equipment." J.A. at 616 (Aug. 14, 2006, Trial Tr., Roger Wabeke Test. at 245:8-9).

Wabeke described level A personal protective equipment as "a fully encapsulated clothing set. It covers the head, the thorax, the torso, the arms, the legs, the feet, and it's entirely a suit into itself inside of which is the worker with their self contained breathing apparatus inside." J.A. at 617-18 (Wabeke at 246:23-247:2). In contrast, ample evidence established that TECO gave Taylor and the other crewmen only a paper suit, a small dust mask, and some safety glasses. And Wabeke testified that such a level of protection would not qualify as level A personal protective equipment. It is clear that Taylor presented sufficient evidence for a jury to conclude that TECO was in violation of 29 C.F.R. § 1910.134, the only regulation that the parties discussed at trial.

TECO contends that 29 C.F.R. § 1910.134 is not applicable and instead vaguely claims that OSHA's shipyard regulations are applicable. Because TECO's brief does not refer to any specific regulations, we can only surmise that TECO is referring to 29 C.F.R. § 1915, governing occupational safety and health standards for shipyard employment. The shipyard provisions, however, are inapplicable to Taylor, as the definitions specifically state that "employee means any person engaged in [various ship-repairing or ship-building activities] . . . other than the master, ship's officers, [or] crew of the vessel." 29 C.F.R. § 1915.4(d). Furthermore, TECO claims that Wabeke testified about the confined-space-entry standard, but Wabeke discussed only the standard for § 1910.134, which does not even use the word "confined."[4] The most that can be said about Wabeke's testimony is that he did mention the confined-space-entry standard by name, but he never explained it to the jury. Thus, if the jury relied upon Wabeke's testimony, it must have relied upon Wabeke's description of § 1910.134, not the confined-space-entry standards.[5]

On appeal, TECO argues only with the choice of OSHA standards, not with the application of OSHA itself. We, however, found it unclear whether OSHA standards apply at all. In 1996,

---

[4] Although Taylor provided a proposed jury instruction that discussed the confined-space-entry standard, the district court never gave a similar instruction to the jury.

[5] The jury was not given a specific instruction about any OSHA standard. Instead, the instruction for the Jones Act claim said that "Negligence under the Jones Act *may consist of a failure to comply with a duty required by law.*" J.A. at 137 (Instr. No. 10) (emphasis added). Therefore, if the jury concluded that TECO failed to comply with OSHA regulations, it could have done so only by identifying violations of the standards that Wabeke described. Since Wabeke did not describe confined-space-entry standards, the jury could not have found a violation of those standards.

OSHA's Directorate of Compliance Programs published Instruction CPL 2-1.20 (Nov. 8, 1996), clarifying the differences in jurisdiction between OSHA and the U.S. Coast Guard. According to the instruction, "OSHA may not enforce the OSH Act with respect to 'seamen' on inspected vessels including the master, ship's officers and crew members." CPL 2-1.20(G). Not all ships, however, are inspected; the U.S. Coast Guard inspects only "freight vessels, nautical school vessels, off-shore supply vessels, passenger vessels, sailing school vessels, seagoing barges, seagoing motor vessels, small passenger vessels, steam vessels, tank vessels, fish processing vessels of more than 5,000 gross tons, and fish tender vessels of more than 500 gross tons." CPL 2-1.20(K)(1). Distinguishing among ships is crucial because uninspected vessels are still subject to OSHA standards. *See* CPL 2-1.20(R). Whether OSHA or Coast Guard regulations apply is a highly factual question; because the parties did not brief the issue, and it was not addressed at the district court, we cannot resolve the question. Resolving the question, however, is unnecessary. Whether TECO violated the OSHA standard was relevant only to Taylor's Jones Act claim because the jury was instructed that "[n]egligence under the Jones Act may consist of a failure to comply with a duty required by law." J.A. at 137 (Instr. No. 10). In contrast, the jury received no comparable mention of legal standards in the instruction for Taylor's unseaworthiness claim. *See* J.A. at 141 (Instr. No. 13). Because the jury found TECO liable under both claims, even if the district court erred in using the OSHA standard, it would have had no effect on the outcome of the trial.

Accordingly, there was sufficient evidence to support the jury's conclusion that TECO violated 29 C.F.R. § 1910.134. In addition, TECO is incorrect that the appropriate OSHA standard is that for shipyards. However, on this record we are unable to determine whether OSHA governs this case. That said, even if OSHA does not apply, the testimony regarding OSHA would not have affected Taylor's unseaworthiness claim.

### 3.  Abnormal Reaction to Harmless Substance

#### a.  The *Short* Case

TECO also asserts that it was entitled to a judgment as a matter of law or a new trial because it cannot be liable for an abnormal reaction to a harmless substance. In support of this argument, TECO relies upon *Short v. Edison Chouest Offshore, Inc.*, 638 So. 2d 790 (Ala. 1994), an Alabama Supreme Court case that summarily adopted the opinion of an Alabama trial court. In *Short*, the plaintiff developed occupational asthma but was unable to point to any substance on the ship that may have caused the reaction. In addition, no other crew member developed a reaction. In considering the seaworthiness claim, the Alabama Supreme Court adopted the trial court's determination that "the plaintiff cannot recover from defendants because there can be no recovery for injuries which result from allergic or idiosyncratic reactions to otherwise harmless substances." *Id.* at 793. The Alabama trial court reached this conclusion by citing one of our opinions, which the Alabama trial court interpreted as importing products-liability law into the development of general maritime law. *See id.* (citing *Miller*, 989 F.2d 1450).

TECO is asking us to follow *Short* and use a rule from products-liability law in order to conclude that Taylor cannot recover for an idiosyncratic reaction to a harmless substance. We do not need to address the complex question of whether we may appropriately apply products-liability rules in general maritime law, for even if we concluded that the plaintiff cannot recover for an idiosyncratic reaction to a harmless product, it was not an abuse of discretion for the district court to conclude that Taylor's reaction was not idiosyncratic and that Bitumastic was not harmless. The record establishes that Bitumastic caused reactions in several of TECO's employees. While the extent of Taylor's reaction may be unique, he certainly was not the only one to have a reaction. Dubrock, TECO's manager of safety and training, testified that in April 1997, he learned that two deckhands suffered chemical burns when they cleaned the Bitumastic-coated water tank on the M/V Cecilia M. Also, Darryl Warren, one of the deckhands on the Cecilia M, confirmed that he suffered

burns after cleaning the tank aboard that ship.  At the same time that Taylor cleaned the tank on the M/V Ann Peters, two other seamen also suffered chemical burns.  This evidence clearly supports the conclusion that Taylor's reaction was not idiosyncratic and that Bitumastic is not harmless.  The district court, therefore, did not err when it refused to grant a new trial or a judgment as a matter of law on the basis of the *Short* case.

### b.  Jury Instruction on Harmlessness

In the alternative, TECO argues that the jury should have been instructed to decide whether Bitumastic was harmless.  "This court reviews a district court's refusal to give a requested jury instruction under an abuse of discretion standard.  A district court's refusal to give a jury instruction constitutes reversible error if (1) the omitted instruction is a correct statement of the law, (2) the instruction is not substantially covered by other delivered charges, and (3) the failure to give the instruction impairs the requesting party's theory of the case."  *Tompkin*, 362 F.3d at 901 (citation omitted).  A party needs only a slim amount of evidence to support giving a jury instruction, but jury instructions must be reviewed as a whole to determine whether an instruction is necessary.  *See Hurt v. Coyne Cylinder Co.*, 956 F.2d 1319, 1327 (6th Cir. 1992).

The district court did not abuse its discretion when it refused to give TECO's proposed jury instruction.  Although TECO claims in its brief that its proposed jury instruction would have asked the jury to decide if Bitumastic was harmful, its proposed instruction was actually rather different.  Instead, on the basis of *Short*, TECO sought a jury instruction regarding hypersensitive reactions that stated that "[t]he defendant is not liable to the plaintiff if the plaintiff's condition/injury is the result of any hypersensitivity or unusual reaction to a substance that is useful and safe to most people."  J.A. at 106 (TECO Instr.).  TECO's proposed instruction was not a narrow question of harmful versus harmless; rather, it was a restatement of *Short*.

We need not address whether the use of *Short* was even appropriate because the court did not abuse its discretion in concluding that TECO's instruction was unnecessary.  Nowhere did the district court instruct the jury that Bitumastic was not harmless.  Instead, under the jury instructions for the Jones Act and unseaworthiness, the jury could have concluded that Bitumastic was perfectly safe and that TECO had no duty to Taylor regarding Bitumastic.  TECO was allowed to present evidence to support that position, and TECO did in fact try to prove that dried Bitumastic was safe.  *See* J.A. at 801 (Kalnas at 558:3-4) ("Once the substance has dried, the volatiles are really gone.").  The jury instructions, taken as a whole, provided TECO with ample opportunity to establish Bitumastic's harmlessness.  Thus, the district court did not abuse its discretion when it refused to give TECO's proposed jury instruction.

## C.  Excessive Verdict

### 1.  Standard of Review

"We will not find an award excessive if the verdict is within the range of proof and the jury was properly instructed."  *Leila Hosp. & Health Ctr. v. Xonics Med. Sys., Inc.*, 948 F.2d 271, 278 (6th Cir. 1991) (internal quotation marks omitted).  "In evaluating the jury award, the primary consideration is whether the award is within the range of proof.  '[T]he determination of whether a jury's verdict is excessive is resolved by the discretionary consideration of the trial judge.  Absent clear abuse of discretion, appellate courts will not make their own appraisals.'"  *Meyers v. Wal-Mart Stores, E., Inc.*, 257 F.3d 625, 633 (6th Cir. 2001) (alteration in original) (quoting *Padgett v. Southern Ry. Co.*, 396 F.2d 303, 309 (6th Cir. 1968)).  "[I]t matters only that the award itself is supportable by a reasonable interpretation of the evidence."  *Jackson v. City of Cookeville*, 31 F.3d 1354, 1361 (6th Cir. 1994).  "Unless the award is (1) beyond the range supportable by proof or

(2) so excessive as to shock the conscience, or (3) the result of a mistake, we must let the award stand." *Leila Hosp. & Health Ctr.*, 948 F.2d at 278 (citation omitted).

"When considering whether an award is excessive, the Court will consider . . . the nature and extent of the injuries, suffering, expenses, diminution of earning capacity, inflation and high cost of living, age and expectancy of life." *Thompson v. Nat'l R. R. Passenger Corp.*, 621 F.2d 814, 827 (6th Cir.) (citations omitted), *cert. denied*, 449 U.S. 1035 (1980).

### 2. Excessiveness of the Verdict

TECO's final argument is that the jury's one million dollar verdict was excessive. We disagree; the jury's award was supported by the evidence presented.

On the basis of Taylor's 43.17-year life expectancy, Taylor's counsel presented several figures to the jury, each of them based upon thirty-five years of future damages. Using this thirty-five year figure, Taylor's counsel suggested to the jury that they could award between $35 per day and $65 per day for 35 years for pain and suffering. Such figures would yield an award ranging from $447,125 to $830,375. The jury awarded Taylor $725,000 for pain and suffering. Thus, the pain and suffering award was within the range Taylor's counsel suggested.

Taylor's counsel suggested that Taylor deserved $164,500 for medical expenses. Once again, he calculated this by multiplying Taylor's expenses, which are uncontested, over a thirty-five year span. The jury awarded $200,000 for future medical expenses.

Next, Taylor's counsel suggested that Taylor deserved $99,000 for transportation to his phototherapy treatments. The jury awarded $70,000 for transportation.

When the jury combined these figures with compensation for the $5,000 that Taylor already paid in medical expenses, it reached a total verdict of one million dollars. Had the jury awarded the maximum figures that Taylor's attorney suggested, the jury award would have been, at most, $1,098,875. Thus, the jury's total award was well within the amount that Taylor requested.

The only part of the jury award that exceeded the requested amount was the award for future medical expenses. This award of $200,000 for future medical expenses, however, was not outside of the range of proof. Although Taylor's attorney used thirty-five years as a conservative estimate of Taylor's life, the attorney also noted that Taylor had over a forty-three-year life expectancy. When the same medical expenses are extended over a forty-three-year span, Taylor's medical expenses would total $202,100. "Accordingly, the jury award was not outside the range argued for by the Plaintiff." J.A. at 41 (Mem. Op. at 8).

Because the award was within the range of proof and because TECO does not object to the underlying evidence supporting the figures that Taylor's attorney used, we conclude that the jury award was not excessive.

### III.  CONCLUSION

For the preceding reasons, we **AFFIRM** the judgment of the district court.