*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 09a0096p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____



TOMMY G. MORGAN,

    *Plaintiff-Appellee,*

  *v.*

     No. 07-4186

NEW YORK LIFE INSURANCE CO.,

     *Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 05-02872—James S. Gwin, District Judge.

Argued: September 17, 2008

Decided and Filed: March 12, 2009

Before: COLE and GILMAN, Circuit Judges; MILLS, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Thomas M. Peterson, MORGAN, LEWIS & BOCKIUS, San Francisco, California, for Appellant. Erwin Chemerinsky, DUKE UNIVERSITY SCHOOL OF LAW, Durham, North Carolina, for Appellee. **ON BRIEF:** Thomas M. Peterson, MORGAN, LEWIS & BOCKIUS, San Francisco, California, Michael L. Banks, MORGAN, LEWIS & BOCKIUS, Philadelphia, Pennsylvania, Gregory V. Mersol, Thomas D. Warren, BAKER & HOSTETLER, Cleveland, Ohio, for Appellant. Erwin Chemerinsky, DUKE UNIVERSITY SCHOOL OF LAW, Durham, North Carolina, Christopher P. Thorman, Daniel P. Petrov, Peter S. Hardin-Levine, THORMAN & HARDIN-LEVINE, Cleveland, Ohio, Jonathan S. Massey, Bethesda, Maryland, Anthony Z. Roisman, NATIONAL LEGAL SCHOLARS LAW FIRM, Lyme, New Hampshire, for Appellee.

---

[*] The Honorable Richard Mills, United States District Judge for the Central District of Illinois, sitting by designation.

———————————

**OPINION**

———————————

RICHARD MILLS, District Judge. Tommy G. Morgan was terminated as a managing partner with New York Life.

He brought an age discrimination action under the Ohio Civil Rights Act, R.C. § 4112.

The jury found in his favor.

The jury awarded him $6,000,000 in compensatory damages and $10,000,000 in punitive damages.

New York Life raises several issues on appeal: (1) that the district court erred in denying New York Life's motion for judgment as a matter of law and abused its discretion in denying New York Life's motion for a new trial despite its alleged legitimate business justifications for Morgan's termination; (2) that the district court abused its discretion in admitting statements of alleged age animus that were unrelated to Morgan and were not proximate in time to his termination; (3) that the district court abused its discretion in declining to give New York Life's proposed jury instruction relating to statements of alleged age animus; and (4) that the district court improperly upheld the punitive damages award because the amount is excessive and does not comport with due process.

For the reasons that follow, we find no error in the district court's decision to deny New York Life's motion for judgment as a matter of law and motion for a new trial. Moreover, the district court did not abuse its discretion in admitting statements of alleged age animus or in declining to give New York Life's proposed jury instructions. Thus, we **affirm** its judgment as to the compensatory damages award.

However, we **vacate** the punitive damages award and **remand** the case to the district court with instructions to enter an order of remittitur reducing the award.

## I. BACKGROUND

(A)

On January 1, 2000, Tommy Morgan, who at the time was 45 years old, was appointed managing partner of New York Life Insurance Company's Northern Ohio office. New York Life conducts a nationwide business selling from its local offices life insurance, annuities, and related products and services. As managing partner, Morgan was the senior executive in charge of the Cleveland office and was responsible for achieving the performance goals set by the company for the office and its sales agent force. The company has approximately 120 "general offices" that are organized into four zones, each with 30 to 35 general offices. Previously, Morgan had worked four years as managing partner of New York Life's smaller Corpus Christi office. The Cleveland office is in the South Central Zone.

An office's success is determined largely by sales revenue and manpower. The two interact in that sales are made by agents and managing partners such as Morgan recruited new agents, trained and retained existing agents, and selected and trained other managers who would also recruit agents. According to Phil Hildebrand, who was co-head and executive vice-president of insurance operations, manpower growth "represents everything" including future sales and the future management of the company. Thus, the growth of the company from within was integral to its success. The managing partner also ensured that his office adhered to company and regulatory standards.

During his tenure as managing partner, Morgan earned between $500,000 and $1,000,000 per year. The pay of any managing partner is based on objective criteria. Managing partners receive a base pay that will increase or decrease depending on sales and manpower performance. Robert O'Neill, the chief operating officer of the South Central Zone, testified that if manpower grows faster than the assigned goal, the managing partner can earn up to 25% more. If it drops, managing partner pay may fall as much as 20%.

Prior to Morgan's arrival, the Cleveland office was performing well under the leadership of Eric Campbell. Early in his tenure, Morgan was given and agreed to a series of performance benchmarks for his position. Other managing partners received similar benchmarks. Manpower growth was an important component. Morgan was to personally recruit at least eight new agents each year, assure that office recruiters meet their new-agent enlistment goals each year and cultivate retention of existing agents. The parties dispute how well Morgan performed.

(B)

New York Life notes Morgan's year-end 2001 evaluation shows that he fell below office performance targets in each of the several categories, including actual office results versus goal revenue, new organization growth, life production, paid life growth, manpower and retention. The company uses an index that it calls Growth Profitably and Accountability ("GPA") as one means of measuring a manager's performance. Managing partners are periodically given a GPA score, ranging from 0 to 4.0+, based upon several performance criteria. Morgan's 2001 final adjusted GPA was 2.25. According to the mid-2002 evaluation, Morgan failed to meet all but one of the seven targets set for his office. He exceeded his goal for manpower growth. Morgan's mid-2002 GPA was 1.71. Morgan's year-end 2002 evaluation showed significant improvement in many areas; New York Life notes, however, that actual results were more than 14% below goals and life production growth was minus 10.8%, rather than the target of plus 10%. Morgan met or exceeded his goals in the other categories. His GPA was 2.57. Morgan's year-end 2003 evaluation shows that he again failed to meet several goals, including manpower growth. The number of agents in the Cleveland office fell from 139 to 127. Morgan was told to focus on recruiting, manpower development and retention.

Morgan alleges that he consistently surpassed the performance criteria set for him. Consequently, he earned higher-than-expected income each year from 2000 to 2003. Moreover, the average in first-year commissions was significantly higher during Morgan's tenure than it was in the five years before he arrived. According to Morgan,

however, a series of events which were beyond his control plagued the office. In 2000, Barrett Weinberger was ranked second in the nation among all agents. He soon became disabled and "his production went from about $600,000 to zero." Another agent, John Tijanich, embezzled over $5 million from New York Life clients. New York Life stipulated that Morgan was not at fault in any way. Jack Guttman, a veteran agent who predated Morgan's arrival, was involved in some "wrong dealings, completely unrelated to the insurance industry, and NYL terminated his contract."

According to New York Life's Manual for managing partners, a written Performance Improvement Program should be established if the GPA is less than 1.5. It further provides that a "Performance Warning" should be issued if the GPA is less than 1.5, or performance shows a continuous decline, even if the Overall Rating is acceptable. New York Life's internal evaluation and accountability system includes various cautionary directives that can be given to managing partners: performance alert, written performance warning, final notice and termination. These are typically progressive steps. According to New York Life, Morgan's July 2004 performance warning was based on multi-year downward trends. He first received a warning rather than an alert because, according to Robert O'Neill, Morgan "really wasn't eligible for an alert." New York Life set performance requirements for Morgan to meet by December 31: a GPA of 2.0 or more; 10% increase in new organization first-year commissions; and a three-year "pro-active" agent retention rate of 23%.

At the time of Morgan's performance warning, New York Life calculated his GPA as 1.5, a number Morgan disputed, claiming it should have been 1.71. According to Brad Willson, who succeeded Paul Morris[1] as Senior Vice-President of the South Central Zone, the GPA played only a small part in Morgan's performance warning. Downward office trends were the primary consideration. Willson stated that any GPA discrepancy would not have affected the decision. At the time, Morgan acknowledged that improvement was needed in several areas.

---

[1] Morris was promoted to Senior Vice-President in charge of Agency and moved to New York Life's headquarters.

When Morgan's performance did not improve after being placed on performance warning, he was placed on final notice. It was Willson's decision to place Morgan on this status. According to New York Life's manual, "A Performance Notice (or final Notice) is issued in those situations where prior actions have not produced satisfactory results or where performance has deteriorated so rapidly that urgent action is required." "At the end of the performance or final notice period, if the Managing Partner has not reached the objective specified in the improvement plan, his or her Managing Partner's contract should be terminated."

Morgan's final written notice stated that he would be removed as managing partner if he did not meet seven specified requirements by June 30, 2005. One requirement was a five percent growth in manpower, which meant increasing the number of agents to 99. By June 30, 2005, it looked as though Morgan had satisfied each requirement, including the five percent manpower increase. He reported exceeding his goal of 99 agents by three. According to Morris, four of the agents reported as part of the manpower increase (Zeno, Abbott, Kumahor, and Chorak) met the $500 commission revenue requirement only by splitting commissions with other agents already in the office manpower count. Morris explained that a proper commission split occurs when two agents work together to secure business and agree to share the commission earned by their combined efforts. New York Life sought to avoid having poorly qualified recruits count in manpower because experience taught that these agents were often unsuccessful. Manipulation of first-year commissions was against company policy.

After an investigation, the corporate vice-president for agency standards, Christopher Tebeau, determined that four of the manpower triggers were based on splits that "were not consistent with NYL's rules." Tebeau stated that three of the splits appeared to be gifts and the explanation as to the fourth was a lie. New York Life alleges that when those four commission splits were deducted from Morgan's Cleveland manpower count, he fell below the manpower count given to him as part of his final notice. Morgan states that he was told by O'Neill in August 2005 that although a few of the splits were questionable and would not be allowed, the rest were acceptable and

that he met his requirement. On September 18, O'Neill called again and told Morgan that a fourth commission split (involving Zeno) was in doubt. Morgan acknowledged that Zeno did no work on the sale of the annuity for which he received a 95% split.

On September 19, 2005, Morgan met with Willson and O'Neill. They informed Morgan that his employment was terminated because he failed to meet the manpower requirements, as provided in New York Life's written manual. Willson testified that he consulted with O'Neill in deciding to discharge Morgan. Morgan was replaced by Mo Abdou, the 40-year old manager of New York Life's Orlando office.

According to Morgan, New York Life's decision to replace Morgan with Abdou is revealed in a document entitled "Managing Partner Selection Process," which specifically referred to the Cleveland office. The document contains the notation, "Update of 09/02/05," and listed the candidates for replacing the Cleveland managing partner. The date listed appears to show that Abdou had been selected for the position on or before September 2, 2005, a date before New York Life had determined that Morgan failed to meet the manpower requirement. A New York Life witness testified that only a portion of the continuously-updated list was created on September 2 and the remainder was created on September 21.

(C)

Morgan filed suit against NYL. The district court granted New York Life's summary judgment motion as to Morgan's sex discrimination and defamation claims. Morgan's claim for age discrimination under Ohio law and his claim for reverse race discrimination proceeded to trial. New York Life moved in limine to exclude certain statements that Morgan proposed to offer as evidence of alleged animus toward older workers. The trial court denied the motion. New York Life proposed a jury instruction to guide the jury in evaluating any age-related statements attributed to it and admitted into evidence. The court declined to give the instruction. New York Life moved for a directed verdict on the age discrimination claim, which the court denied.

The jury found in favor of Morgan on his age discrimination claim and awarded him $1,000,000 in past and $4,500,000 in future economic compensatory damages, $500,000 in non-economic compensatory damages, and $10,000,000 in punitive damages. It found in favor of New York Life on Morgan's race discrimination claim. Judgment was entered and the court denied New York Life's reserved directed verdict motion as to punitive damages. New York Life filed various post-trial motions, which were denied by the district court on August 16, 2007. New York Life filed its timely notice of appeal on September 12, 2007.

## II. ANALYSIS

*A. Admission of Age-related Statements without a Jury Instruction*

(1)

We will first consider whether the district court erred in admitting what Morgan claims are age-related statements made by Senior Vice-President Morris and Executive Vice-President Hildebrand, and whether the district court should have given New York Life's proposed jury instruction if the statements were admitted. A district court's evidentiary rulings, including its refusal to give a proposed jury instruction, are reviewed for abuse of discretion. *See Taylor v. TECO Barge Line, Inc.*, 517 F.3d 372, 378, 387 (6th Cir. 2008).

New York Life claims the district court improperly admitted certain prejudicial age-related statements, thus requiring a new trial. New York Life contends that such remarks carry with them a high risk of prejudice in an age discrimination case because, if there is no other evidence of discrimination, the statements add "an emotional element that was otherwise lacking as a basis for a verdict." *See Schrand v. Federal Pacific Elec. Co.*, 851 F.2d 152, 156 (6th Cir. 1988). According to the company, therefore, the statements should be excluded under Federal Rule of Evidence 403.

Courts examine several factors in determining whether an employer's age-related statements evince bias. These include "(1) whether the statements were made by a decision-maker or by an agent within the scope of his employment; (2) whether the

statements were related to the decision-making process; (3) whether the statements were more than merely vague, ambiguous or isolated remarks; and (4) whether they were made proximate in time to the act of termination." *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 478 (6th Cir. 2002). Statements such as a company is a "young, vibrant, sales organization" and "it is time for the next generation" are alone not enough to establish direct evidence of age discrimination when they are not said to or made about the plaintiff.[2] *See Smith v. E.G. Baldwin & Assoc., Inc.*, 695 N.E.2d 349, 353 (Ohio App. 1997).

(2)

An August 31, 2005 email from Hildebrand announced various management changes and referred to "a new generation of managerial talent." However, New York Life points out that three of the five managers referenced in that memorandum as receiving better jobs (Ray (55), McKinley (51), and Willson (51)) were Morgan's age or older. Thus, New York Life claims no inference of age bias can be drawn. Moreover, the company notes that a statement several years earlier (in a 2001 letter) that "time has passed him by" related to Jim Torrell. New York Life further contends that Morgan also relied upon a three-year-old statement made in an October 15, 2002 letter of Morris regarding the hiring of an entry-level sales employee, which stated "we need to bring young people like this through our system." Morris testified that New York Life needed a "balance of ages" for its employees. NYL asserts these statements were either not relevant or were too remote in time. O'Neill acknowledged the performance reviews that Morris did are "littered with age-related references."

At trial, substantial evidence of age discrimination was presented by Morgan. Although many of these statements are not particularly relevant to the employment decision at issue, we are unable to conclude that there was a significant risk of prejudice

---

[2]New York Life cites pages 3, 19 and 21 of the district court's order in arguing that it erred in treating the alleged ageist comments as direct evidence of discrimination. It does appear that the court erred in describing this evidence as "direct." *See Srail v. RJF Internat'l. Corp.*, 711 N.E2d 264, 271 (Ohio App. 1998) (noting that statements which are remote in time and do not relate to discriminatory acts are not direct evidence of discrimination).

based on the district court's admission of them. New York Life also emphasizes the district court's erroneous classification of certain statements–those statements made by Morgan's superiors about someone else–as direct evidence. However, this error was made in the district court's post-judgment rulings, not in any statement to a jury. Accordingly, there was no risk of prejudice based on the court's description of the evidence.

New York Life suggests that this classification distorted the relevancy analysis of this circumstantial evidence under Rules 401 and 403 of the Federal Rules of Evidence. Some of the comments were vague or isolated remarks and were not proximate in time to Morgan's termination. Others were fairly innocuous. It is therefore doubtful that the jury relied significantly on the statements in reaching its verdict. Although most of the statements were thus not particularly probative of discrimination, there was little risk of prejudice in admitting them. Therefore, the admission of the statements was not an abuse of the district court's discretion.

(3)

New York Life next alleges that if the age-related statements were properly before the jury, then the district court should have instructed the jurors on how to evaluate them. New York Life's proposed instruction read as follows:

> A plaintiff may prove age bias, either directly or indirectly, by offering evidence of remarks that are:
>
> 1.     age related;
> 2.     close in time to the employment decision at issue;
> 3.     made by an individual with authority over the employment decision at issue; and
> 4.     related to the employment decision at issue.
>
> If the remarks are ambiguous, not close in time or related to the employment decision, and are not made by the decision maker, you should not rely on them as proof of age discrimination.

The district court found that New York Life "offers no authority whatsoever in support of its argument that such an instruction was required, let alone sufficient evidence that

the Court's refusal to instruct the jury in this manner produced a 'seriously erroneous result.'"

The Court "reviews jury instructions as a whole to determine whether they fairly and adequately submitted the issues and applicable law to the jury." *Arban v. West Pub. Corp.*, 345 F.3d 390, 404 (6th Cir. 2003). A new trial is not required "unless the instructions, taken as a whole, are misleading or give an inadequate understanding of the law." *Id.* "A district court's refusal to give a jury instruction constitutes reversible error if (1) the omitted instruction is a correct statement of the law, (2) the instruction is not substantially covered by other delivered charges, and (3) the failure to give the instruction impairs the requesting party's theory of the case." *Taylor*, 517 F.3d at 387.

While such an instruction would not have been inappropriate, the district court did not abuse its discretion in declining to give it. Morgan correctly points out the jury was properly instructed that it was to determine solely whether the termination was discriminatory and it was not to be swayed by sympathy or emotion. Moreover, New York Life was free to argue its theory of the case–that the remarks were vague or were not related to the employment decision. Thus, the proposed instruction was substantially covered by the other instructions and the failure to give it did not seriously impair New York Life's theory of the case. We find, therefore, that the district court did not abuse its discretion in declining to give New York Life's requested jury instruction.

*B. NYL's Motion for judgment as a matter of law or new trial*

(1)

We review *de novo* the denial of a party's motion or renewed motion for judgment as a matter of law. *See Barnes v. City of Cincinnati*, 401 F.3d 729, 736 (6th Cir. 2005). "Judgment as a matter of law may only be granted if, when viewing the evidence in a light most favorable to the non-moving party, giving that party the benefit of all reasonable inferences, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion in favor of the moving party." *Id.* "In reviewing the district court's decision, we may not weigh the evidence, pass on the

credibility of witnesses, or substitute [our] judgment for that of the jury." *Imwalle v. Reliance Medical Products, Inc.*, 515 F.3d 531, 543 (6th Cir. 2008) (internal quotation marks and citations omitted).

We review the denial of a party's motion for a new trial for abuse of discretion. *See Barnes v. Owens-Corning Fiberglas Corp.*, 201 F.3d 815, 820 (6th Cir. 2000) (citation omitted). Reversal is warranted only if the court has "a definite and firm conviction that the trial court committed a clear error of judgment." *Id.* (internal quotation marks omitted).

(2)

New York Life claims that the district court erred in denying its motion for judgment as a matter of law or new trial on Morgan's age discrimination claim. Under Ohio law, an employer may not discriminate on the basis of age. *See* Ohio Rev. Code § 4112.02(A).

The same evidentiary framework used in analyzing claims under the federal law is also applied to age discrimination claims under Ohio law. *See Campbell v. PMI Food Equipment Group, Inc.*, 509 F.3d 776, 785 (6th Cir. 2007) (citation omitted). A plaintiff must show that age was a "determining factor" in the employer's decision. *See id.* "The *McDonnell Douglas* test requires a plaintiff to first establish a prima facie case of age discrimination by showing that the plaintiff (1) was a member of a protected class of persons (i.e., a person age 40 or over), (2) was discharged, (3) was qualified for the position held, and, lastly, (4) was replaced by someone outside of the protected class." *Id.*

If the plaintiff meets his prima facie case, the burden then shifts to the employer to produce evidence of a legitimate, nondiscriminatory reason for the challenged employment action. *See Imwalle*, 515 F.3d at 544. If the employer meets its burden of production, the plaintiff must then show by a preponderance of the evidence that the legitimate reason proffered by the employer was not the true reason, but instead was a pretext for discrimination. *Id.* We have held that "the reasonableness of an employer's

decision may be considered to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003). "An employer's business judgment . . . is not an absolute defense to unlawful discrimination." *Id.*

After a trial on the merits, this Court no longer considers whether a plaintiff has established a prima facie case. "Both the Supreme Court and this court . . . have held that a party framing its argument on appeal in prima facie terms, after a jury trial on the merits, has unnecessarily evaded the ultimate question of discrimination *vel non*." *Imwalle*, 515 F.3d at 545 (internal quotation marks and citations omitted). A court's duty at this stage is to determine the ultimate question: whether a plaintiff has produced sufficient evidence to support a jury's verdict that the employer discriminated against him on the basis of age. *See id.* at 545-46. However, courts review "all of the evidence in the record," including evidence supporting the plaintiff's prima facie case. *See id.* at 546 (quoting *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150 (2000)).

The Supreme Court has stated that "it is *permissible* for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Reeves*, 530 U.S. at 147 (emphasis in original). "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Id.*

(3)

Morgan alleged that New York Life was determined to fire him because of his age. The company claims that it had business justifications for terminating Morgan. He himself admitted that both revenue and manpower had fallen. New York Life contends that although the district court found that Morgan's performance had improved in certain areas, that does not alter the undisputed evidence of downward revenue or manpower trends. Moreover, Robert O'Neill testified that because the Cleveland office was among the 20 largest in the country, he would expect it to be one of the top performing offices.

New York Life further alleges that the combined annual growth rate ("CAGR") analysis, which it sometimes used because of the fluctuation inherent in GPA, showed that Morgan's office was spiraling downward. However, Morgan contends that because New York Life used a four-year CAGR instead of the usual five, he did not receive proper credit for the growth that took place in his first year as managing partner in Cleveland. New York Life states that a four-year analysis was used because Morgan did not run the office before 2000.[3] Additionally, New York Life claims there is no basis to dispute the conclusion of its auditor, Christopher Tebeau, that four of the commission splits used to satisfy Cleveland manpower growth were inconsistent with company policies. New York Life also asserts that the evidence is disputed that Mo Abdou's name was selected from a list of managing partner candidates "updated 09/02/05," meaning that the list of available candidates was updated then, not that the decision to terminate Morgan's employment was made then, instead of a date later in September.

New York Life further asserts that the evidence does not support a finding of age discrimination against Morgan based on disparate treatment of other managing partners. The district court's comparison of Abdou with Morgan is misplaced according to New York Life because, despite Abdou's GPA scores of 1.71 and 1.93 in 2004 and 2005, it would have been contrary to policies to place him into remedial performance status.[4] Such action is authorized only when the GPA is below 1.5 or, as in Morgan's case, key office performance trends are down. New York Life claims this was not true as to Abdou. Paul Morris stated that Abdou's office "had one of the better growth patterns in the zone during the years that [he] was in Atlanta." Additionally, New York Life asserts that regarding the other managing partners the court addressed, there is no foundational basis to compare them with Morgan, even if the company occasionally

---

[3] Morgan's employment as the Managing Partner of the Cleveland office commenced on January 1, 2000. Because he ran the office for the entire year, New York Life's explanation as to why 2000 was not included in the CAGR analysis in assessing Morgan's performance appears to make little sense.

[4] New York Life claims that the district court misread Abdou's GPA. At the end of 2004, his GPA was 3.07, not the 1.71 stated by the district court. His June 2005 GPA was 2.14, not the 1.93 that the court attributes. It appears that Abdou had a 1.71 GPA at the end of 2003. Moreover, Abdou's GPAs from February through June 2005 were 1.79, 1.00, 0.93, 1.07 and 2.14. However, New York Life states that an individual's monthly GPA scores are not used for performance-related action.

exercised its discretion to deviate from its normal rules for others under dissimilar circumstances. New York Life notes, moreover, that Morgan was not placed into any performance program after his star agent, Weinberger, became disabled in 2001. He was not given a warning until downward trends continued.

Morgan points to several examples of when New York Life appears to have deviated from its normal rules. In 2001, Ken Savoie, who is younger than Morgan and was the managing partner of the Roanoke office, had an unadjusted GPA of 0.57, and an adjusted GPA of 1.57. Savoie was placed on "performance alert" and New York Life determined he would be brought in for training "with several young Managing Partners who are in need of direction." New York Life claims that Savoie was not placed on performance warning because, under its policy, new managing partners receive an automatic adjustment to GPA, which resulted in Savoie's being increased from 0.57 to 1.57. Morgan states that no training like that which Savoie received was provided to older managing partners. By 2003, Savoie's GPA was 1.93. In July 2004, Willson noted that Savoie's GPA had been below 1.50 every month that year and he would therefore be placed on "performance warning." In March 2005, New York Life informed Savoie that he had "missed two of his targets, manpower growth and percentage of plan." Savoie was told his employment would be terminated if he failed to meet five new objectives. Savoie did not meet each objective. Instead of increasing critical "New Organization" production by the 5% criterion, Savoie's production fell 31%. His employment was not terminated.

Morgan also notes that in June 2004, the same month he was placed on performance warning, Randy Cox was ranked 66 out of 69 partners and had a GPA of 1.22. O'Neill testified that although New York Life's policy is that individuals with GPAs below 1.5 are ineligible for promotion, the 39-year old Cox was promoted.

In June 2005, Amy Scott was the managing partner in Columbus, Ohio. At the time, she was 36 years old and had a GPA of 1.50. Despite the relatively low GPA, Scott was promoted. O'Neill noted that Scott's maternity leave was an extenuating circumstance in assessing her performance.

Morgan notes that Jeff Slattery was a substantially younger managing partner in Memphis. Although Slattery's GPA in 2001 was a mere 1.25, he was praised by Morris as a "great young talent." Slattery was told that he needed to emphasize recruiting and "increase activity and selection." New York Life did not place him on performance alert or performance warning.

Morgan claims older employees were not treated as favorably. Managing Partner Don Helms, who was over 50 years old, headed the Atlanta office and was placed on performance alert in December 2004 when his GPA was 2.07. Helms resigned while under performance warning. In 2005, Paul Morris commended Brad Willson for "show[ing] leadership and handl[ing] a difficult situation in Tampa" by "helping MP Bartlett come to a retirement decision." Bartlett was a 58-year old managing partner who had a GPA of 1.79 and had been placed on warning.

In a September 24, 2001 letter to Phil Hildebrand, Morris noted that 64-year old Managing Partner Jim Torrell had done an "outstanding job for a long time," especially in the previous three years which had been the best of his career. Morris observed, however, that Torrell is "a manager from the past" and "not a manager for the future." Although "time ha[d] passed Jim by", it was "very important to [Morris] that Jim Torrell be treated fairly." Torrell, who had been a managing partner for 37 years, was told that his position at the Fairfax, Virginia office was being eliminated as the result of a merger and he did not have a choice in the matter. Torrell testified that although he had never discussed retirement plans with New York Life and had no desire to retire, company officials picked his "retirement" date.

(4)

Morgan also notes that O'Neill testified that he first discussed with Hildebrand Morgan's possible termination as early as August 2004.[5] He further claims that various events were part of a deliberate scheme to terminate him. These include:

---

[5]O'Neill also states he does not believe they were discussing Morgan's termination at that time. Rather, they were discussing his "evaluation and performance status."

(1) intentionally misstating Morgan's GPA as 1.5 when it was actually 1.71; (2) skipping the first step of performance "alert" and moving directly to performance "warning;" (3) setting unrealistic objectives and then telling Morgan that his numbers "didn't matter" because he was in the home office's "si[ghts];" (4) creating a false impression of a downward trend by improperly using a four-year CAGR instead of the standard five-year CAGR; and (5) pre-identifying a younger replacement, Abdou, before Morgan was terminated. Thus, Morgan asserts that ample evidence supported the jury's verdict.

Morgan further alleges that New York Life has presented shifting explanations that provide additional evidence of discrimination. Morris and Willson apparently falsely told Hildebrand that Morgan signed a confession that he had forged or fraudulently misrepresented a commission transfer form.[6] O'Neill and Morris later testified that the sole reason Morgan was terminated was that he failed to meet the manpower requirement by one agent, in that he had 98 agents at the end of June 2005 instead of the 99 called for in his performance plan. Moreover, there was some confusion about precisely when company officials learned about the problems with the Zeno commission split. Morgan further notes that after initially denying he had a role in the termination decision, Morris eventually acknowledged that the decision ultimately was his. Additionally, although Morris testified that Morgan declined New York Life's offer of another job, he acknowledged there was no document that indicated an offer was made. Morgan testified that he had talked to O'Neill and Willson in early 2005 about transferring, but this apparently was not discussed around the time of his termination.

Morgan contends that New York Life's shifting explanations alone are enough to show discrimination. New York Life claims it has consistently maintained the reason that Morgan was terminated in September 2005 was because he did not meet the performance criteria noted in his final warning: specifically the required manpower count of 99 agents. According to New York Life, the sole reason for Morgan's

---

[6]New York Life notes Hildebrand's testimony that although he did not see such forms in Morgan's file, Morris and Willson told him that Morgan falsely signed a "commission transfer form."

discharge was that he did not meet the manpower goal which followed a continuous downward trend.

Morgan contends that New York Life's statements pertaining to older employees were confirmed by its practices. In 2004 and 2005, six managing partners over the age of 50 either retired or were terminated, while thirteen under 50 were hired. Additionally, Morgan alleges that younger workers received preferential treatment and that performance ratings were manipulated. Morgan asserts that he has presented overwhelming evidence satisfying each and every method of proof, including age-related comments by supervisors, preferential treatment for younger workers, shifting explanations, manipulation of performance warnings and violations of New York Life policy and practice.

(5)

We conclude that there was sufficient evidence for the jury to find that, in terminating Morgan, New York Life discriminated against him on the basis of age. Some of the evidence on which Morgan relies is not particularly strong. As we have noted, most of the age-related comments are somewhat vague in that they do not relate to and were not made close in time to Morgan's termination. Other evidence is stronger. The promotability index prepared by New York Life entitled "Managing Partner Selection Process" listed candidates for Morgan's position and was dated September 2, 2005, which was before the company determined that he had missed the manpower count. Although New York Life alleged that the date was on the document because it was a continuously updated list, the jury was entitled to believe otherwise. As the district court noted, "[T]he jury received evidence that, if believed, supported a finding that New York Life decided to fire Morgan before the employment target ever became an issue." The jury may have also credited O'Neill's statement that Morgan's termination was first discussed in August 2004, though O'Neill also suggests they were simply discussing his "evaluation and his performance status."

Although it is inappropriate for a court to second guess a company's business judgment, New York Life acknowledges deviating from its normal practices in certain

circumstances. New York Life maintains that these were dissimilar circumstances. This is true in at least one respect. Savoie, Cox, Scott, Bravada and Slattery were all younger than Morgan when New York Life departed from its normal practices. All of these individuals received lesser sanctions and in some case cases even favorable treatment despite performance issues. The record supports the district court's finding that New York Life appeared to be much more willing to consider extenuating circumstances in some instances (such as Scott's pregnancy) than it was in evaluating Morgan's performance (such as when Northern Ohio employee John Tijanich embezzled millions of dollars). The district court also contrasted the treatment that the younger managing partners received with that of older managing partners such as Helms and Bartlett, the latter of whom Willson helped to reach a retirement decision, and Torrell, who was not a "manager of the future" because "time has passed Jim by."

We have no trouble concluding that, when the evidence is viewed in a light most favorable to Morgan, a jury could have concluded that Morgan's age was the reason that New York Life did not deviate from its normal practice when he failed to meet his manpower requirement by one agent. Although the evidence may not be overwhelming, we conclude that there is a substantial amount of evidence tending to show that Morgan was terminated because of his age. This evidence was sufficient for the a jury to find that age was a motivating factor in New York Life's employment decision. Accordingly, the district court did not err in denying New York Life's motion for judgment as a matter of law or new trial.

### *C. Punitive damages award*

#### (1)

New York Life next alleges that the award of punitive damages must be reversed because this is not an outrageous case where such an award would be appropriate. The case involves no actual malice and the $10 million award violates due process, according to the company. Morgan asserts the award is consistent with Ohio law and comports with due process.

Punitive damages are awarded in order to punish the defendant for wrongful conduct and deter such future conduct. *See Ahern v. Ameritech*, 739 N.E.2d 1184, 1199 (Ohio App. 2000). In Ohio, such damages are awarded only upon a showing of actual malice. *Rice v. CertainTeed Corp.*, 704 N.E.2d 1217, 1220 (Ohio, 1999). "[A]ctual malice, necessary for an award of punitive damages, is (1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." *Preston v. Murty*, 512 N.E.2d 1174, 1176 (Ohio, 1987). The district court instructed on only the latter definition of actual malice. In Ohio, a plaintiff must show by clear and convincing evidence that he is entitled to punitive damages. *See Cabe v. Lunich*, 640 N.E.2d 159, 162 (Ohio, 1994). Ohio courts have found the presence of actual malice in employment discrimination cases. *See Ahern*, 739 N.E.2d at 1199-1200; *Srail v. RJF Internat'l Corp.*, 711 N.E.2d 264, 274 (Ohio, 1998); *Atkinson v. Internat'l Technegroup, Inc.*, 666 N.E.2d 257, 266-67 (Ohio App. 1995).

In denying New York Life's motion for judgment as a matter of law and motion for a new trial, the district court found that Morgan "has shown clear and convincing evidence that Defendant acted with a conscious disregard for his rights, and that this conscious disregard had a great probability of causing substantial harm." It determined, moreover, that New York Life "willfully disregarded [Morgan's] right to be free from the discriminatory actions of his employer taken on the basis of [his] age."

The district court further observed:

> Notably, Plaintiff offered evidence that each of Defendant's four decisionmakers in the instant case began engaging in conversations concerning his employment status and potential termination as early as August 2004. Rather than placing Plaintiff on a less-serious "performance alert," Defendant skipped this usual cautionary phase and placed Plaintiff on "performance warning" when his GPA allegedly met, but did not fall below the company's benchmark of 1.50. In any case, Defendant admits that Plaintiff's actual GPA never dipped below 1.71; yet, Defendant refused to correct its mistake in the company's records even after Plaintiff notified Defendant of its error. Similarly, Defendant mistakenly understated Plaintiff's performance by employing a four-year history to calculate Plaintiff's combined annual growth rate instead of the

traditional five-year history, thus depriving Plaintiff of any credit for the substantial growth that occurred during his first year of leadership and also increasing the benchmark against which future growth would be measured.

The district court went on to note the more favorable treatment received by younger managing partners such as Savoie, Slattery, Bravada, Scott and Cox. It observed, moreover, that the company record is littered with age-related references. The court found that it was probable that Morgan would be substantially harmed because of New York Life's actions. It noted that if Morgan had been allowed to work another 3.5 years, his pension plan would have become fully vested, resulting in an additional $125,000 of annual retirement benefits. On this basis, the court found the necessary "actual malice" justifying an award of punitive damages.

We are unable to conclude that a punitive damages award in this case violates Ohio law. The record includes evidence that New York Life consciously disregarded Morgan's right to be free from age discrimination. While New York Life correctly argues that courts should not second guess a company's business decisions, the record establishes quite clearly that the company found extenuating circumstances in certain instances when a younger managing partner had performance issues. This was not the case with Morgan (or other older managing partners).

We are mindful that Morgan received a relatively large compensatory damages award. Although we find that Morgan has established by clear and convincing evidence that New York Life consciously disregarded his rights, the issue of whether Morgan presented sufficient evidence that the conscious disregard had a great probability of causing substantial harm is more difficult. It appears, however, that Ohio courts are reluctant to disturb a jury's finding that substantial harm ensued. *See Ahern*, 739 N.E.2d at 1199-1200 (noting that the investigation of plaintiff that resulted in termination thus allowing company to retain the younger manager who fit into the casual atmosphere encouraged by supervisor demonstrated malice); *Srail*, 711 N.E.2d at 274 (finding that actual malice existed because while "plaintiffs were being told that no suitable positions were available, [the defendant] was pursuing an aggressive hiring campaign for technical

and engineering positions" for which plaintiff could not apply). There was evidence from which a jury could conclude that New York Life showed a conscious disregard for the rights of Morgan, which resulted in a great probability of causing substantial harm.

We are unable to conclude that the punitive damages award violates Ohio law. Next, we will consider whether the $10 million award violates the United States Constitution's Due Process Clause.

(2)

New York Life contends that the $10,000,000 punitive damages award violates due process. The three "guideposts" courts look to in evaluating the constitutionality of a punitive damages award are (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the harm to the plaintiff and the award; and (3) the comparison between the award and civil penalties in comparable cases. *See Bridgeport Music, Inc. v. Justin Combs Pub.*, 507 F.3d 470, 486 (6th Cir. 2007) (citing *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003)).

In assessing the reprehensibility of a defendant's conduct in cases such as this where the harm is economic and not physical, we have stated that "the primary considerations to be addressed are [the plaintiff's] financial vulnerability, whether [the defendant's] conduct was repeated, and the culpability of [the defendant's] actions." *See Chicago Title Ins. Corp. v. Magnuson*, 487 F.3d 985, 999 (6th Cir. 2007). New York Life asserts that Morgan is not financially vulnerable, noting that he earned between $500,000 and $1,000,000 during each of his five years in the Cleveland office. Moreover, the case is about a single instance of age discrimination, not repeated misconduct.

Morgan counters by asserting that the focus is on a plaintiff's "financial vulnerability" before trial, not after the verdict. Otherwise, compensatory damages would obviate the need for punitive damages, whose purpose is to "punish[] unlawful conduct and deter[] its repetition." *Philip Morris USA v. Williams*, 127 S. Ct. 1057, 1062 (2007) (citations omitted).

Based on Morgan's salary when he was employed at New York Life, it would not be accurate to describe him as financially vulnerable. However, it is important to note that he was terminated a few years before his pension would have fully vested. Morgan was approximately 50 years old when his employment was terminated. If Morgan were to have difficulty obtaining other employment, then it might be conceivable for him to become financially vulnerable. Based on the salary Morgan received at New York Life and the $6,000,000 compensatory damages award, however, it would seem to be a stretch to describe him as financially vulnerable.

When this factor is applied, it would appear that at least a reduction of the award is appropriate, even if New York Life should be punished to some extent. New York Life correctly points out that this case does not involve a nationwide policy of discrimination. However, it does include repeated misconduct, though the district court found the references to the circumstances of other managing partners to be "minor." Although there is little evidence of a policy of treating older workers more harshly, the record shows that at least three other managing partners were either encouraged to retire or held to different standards than younger workers. Although this case could be said to involve the repeated misconduct of at least some company officials, the conduct of a few New York Life executives in this case would not appear to be so reprehensible as to justify a high punitive damages award, especially given Morgan's apparent financial status.

New York Life asserts that the punitive damages award is grossly disproportionate to whatever harm resulted to Morgan. Morgan notes that the ratio of punitive damages to the compensatory damages awarded is only 1.67:1, which is at the very low end of the "single digit" range endorsed in *Campbell*, 538 U.S. at 425. However, this Court has observed that the Supreme Court "has made clear that '[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of due process guarantees.'" *Bridgeport Music, Inc.*, 507 F.3d at 488 (quoting *Campbell*, 538 U.S. at 425). The Court went on to note that when it previously had found a $400,000 compensatory damages

award to be substantial, it instructed the district court to "enter an order of remittitur reducing the punitive damages award [of more than $2.6 million] to no more than $400,000." *Id.* at 488-89 (citing *Bach v. First Union Nat. Bank*, 486 F.3d 150, 156-57 (6th Cir. 2007)). The $6,000,000 compensatory award is fifteen times more than the amount that we previously found to be substantial. We conclude that an order of remittitur reducing the award by a significant amount is appropriate in this case.[7]

New York Life contends, moreover, that the award is disproportionate to the maximum comparable civil penalty authorized under Ohio law. It notes Morgan could have brought his age discrimination complaints to the Ohio Civil Rights Commission and, if successful, could have been reinstated with back pay. *See* Ohio Rev. Code Ann. § 4112.05(G)(1); Ohio Admin. Code § 4112-3-10(B)(1)(a). There is no provision for punitive damages before that entity in employment discrimination cases such as this. *See* Ohio Rev. Code Ann. § 4112.05(G)(1).

As Morgan notes, however, the administrative scheme noted above is but one option available to a victim of discrimination and the back pay/reinstatement remedy does not address in any way the type or size of civil damages available in court. Moreover, "R.C. § 4112.99 authorizes an award of punitive damages in civil employment discrimination actions." *Rice*, 704 N.E.2d at 1218. The court observed that the Ohio legislature had removed the $5,000 punitive-damages cap. *Id.* at 1219 n.1. The Ohio Supreme Court has stated that, regarding the third guidepost of comparable civil penalties, "the most relevant civil penalty in cases like these is the potential civil damage award in a lawsuit." *Dardinger v. Anthem Blue Cross & Blue Shield*, 781 N.E.2d 121, 143 (Ohio, 2002).

The Ohio legislature has authorized punitive damages awards and juries have awarded such damages in employment discrimination cases. Thus, New York Life's comparison of the jury's award to a legislative grant of authority to award back pay and

---

[7]Morgan claims that New York Life has impliedly waived any argument regarding the disparity between the harm and the punitive damages award because it makes no specific argument regarding the 1.67:1 ratio. However, New York Life did raise the issue of whether the award violated the Due Process Clause.

reinstatement is not a very good analogy. This factor does not appear to strongly favor either party.

The first two factors in the due process analysis favor a reduction of the $10,000,000 punitive damages award. Accordingly, we will vacate the award and remand the case to the district court for an order of remittitur that will set the punitive damages in an amount that it determines is compatible with due process, not to exceed the amount of compensatory damages. *See Campbell*, 538 U.S. at 425.

## III. CONCLUSION

The district court did not abuse its discretion in allowing certain statements of alleged age animus, even though the statements did not relate to Morgan and were not proximate in time to his termination. Moreover, the court's refusal to give New York Life's proposed jury instruction does not constitute reversible error. Because there was sufficient evidence supporting the verdict in favor of Morgan on his age discrimination claim, the district court neither erred in denying New York Life's motion for judgment as a matter of law nor did it abuse its discretion in denying the motion for a new trial. The judgment will be **affirmed** as to the $6,000,000 compensatory damages award.

The $10,000,000 punitive damages will be **vacated** on the basis that it is excessive and does not comport with due process. The district court shall enter an order of remittitur on **remand** in an amount not to exceed the award of compensatory damages.

**Affirmed** in part; **Vacated** in part and **Remanded** with instructions.