NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0582n.06

No. 09-5786

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
**Aug 18, 2011**
LEONARD GREEN, Clerk

| | | |
|---|---|---|
| MARK A. JONES, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE MIDDLE |
| | ) | DISTRICT OF TENNESSEE |
| NISSAN NORTH AMERICA, INC., | ) | |
| | ) | |
| Defendant-Appellee. | ) | OPINION |
| _____ | ) | |
| | ) | |

Before: MARTIN, SUHRHEINRICH, and WHITE, Circuit Judges.

**HELENE N. WHITE, Circuit Judge.** Plaintiff Mark Jones appeals the denial of his

motions for judgment as a matter of law and for a new trial filed after the jury returned a verdict

finding that he did not prove that his employer, Defendant Nissan North America, Inc., discriminated

against him in violation of the Americans With Disabilities Act, 42 U.S.C. § 12101, or the Tennessee

Disability Act, Tenn. Code Ann. § 8-50-103 *et seq*. We **REVERSE** and **REMAND** for further

proceedings.

**FACTS AND PROCEDURAL HISTORY**

Mark Jones began working for Nissan in 1997, as an auto assembly production technician

at Nissan's manufacturing plant in Smyrna, Tennessee. Jones initially worked the night shift on the

metal line where he used power tools to do welding and grinding. Later, he worked the "hood

install" job on the metal line, working on Nissan Altima cars during the afternoon shift. In April 2003, Jones injured his right elbow while working the "hood install" job.

Jones reported his injury to Nissan, and the company provided him with a choice of three treating physicians from whom he could receive treatment. Jones chose Dr. Douglas Weikert, who diagnosed Jones with right lateral epicondylitis, or tennis elbow. Dr. Weikert treated Jones with therapy and cortisone shots, and eventually recommended surgery, which Jones had in September 2004. Dr. Weikert restricted Jones from returning to work until January 2005, and then released him to return to work with no restrictions. As Jones's treating physician for workers' compensation purposes, Dr. Weikert assigned Jones an anatomical impairment rating of 3% to his right arm.

By 2006, Jones was working the day shift in the trim area of the body shop. This job, "body trim fits," entailed light lifting and did not require the use of power tools. Jones used hand tools – specifically a light rubber hammer, a chisel, and a plastic finesse tool – to adjust car panel gaps. As a part of the job, Jones often had to open and close the hoods of various vehicles; some vehicles' hoods had a hydraulic lift, which allows a hood to hold up its own weight, and some did not. Jones made approximately $25 per hour. In January 2006, Jones visited Dr. Weikert again complaining of discomfort in his arm. Dr. Weikert examined Jones and again released him to return to work with no restrictions as of January 18, 2006.

Jones's supervisor, Area Manager Guerry Marsh, found Jones to be a hard worker and was satisfied with his job performance. He never observed Jones being unable to perform, or having difficulty with, any of the tasks associated with his job. Jones never asked for any changes to be made to his duties; nor did he ever complain that he was having difficulty. Marsh testified that Jones

2

could do the lifting associated with the body-trim-fits job and could use all of the tools required for the job, and that there was nothing that caused him to believe that Jones could not physically perform the job.

On June 8, 2006, Jones's workers' compensation claim against Nissan for his right-elbow injury was tried in the Chancery Court for Wilson County, Tennessee, before Chancellor C.K. Smith. The court heard testimony from Jones and Guerry Marsh, and considered Dr. Weikert's deposition.

At the conclusion of the workers' compensation trial, Chancellor Smith gave an oral ruling from the bench, stating, in part:

> So on 9/21/04 Dr. Weikert performed surgery on the plaintiff here. . . . As I stated, [the doctor] put him back to work full-time with no restrictions.
>
> After the surgery the plaintiff says – and he seems to be a very honest, credible witness. There's no reason for me not to believe him. That he's still having pain and couldn't probably do the job that he was doing at the time of his injury because it required a lot of lifting and more use of vibratory tools. He says that he doesn't think he could use tools that – that vibrate a lot. Right now all he has to use is a hammer and a chisel. And according to the video, that's not how one might imagine one using a hammer and a chisel. It's just a pecking. In other words, not a – not a great deal of chiseling going on. It's just kind of knocking – I forget what he called it – but kind of knocking trim in or screw in or something. But it's very light – light type of use of a hammer and a chisel.
>
> He says that – he asked the doctor not to put him on any permanent restrictions because Nissan is – just won't hardly work you if you've got permanent restrictions. But the doctor didn't say anything about that. He just said that the plaintiff had no restrictions.
>
> He says the job[] he's on now – and it doesn't require any heavy lifting, maybe sometime a hood, the trunk, or whatever, the door, or whatever that back hatch is behind those vans might be called. But it's very light because they have some type of spring fed – something that helps raise the hood and so forth. So they're not very difficult to raise. But he feels like [there are] jobs that are there that require a lot of heavy lifting and use of power tools or vibratory tools, that he

3

wouldn't be able to do. He said he would attempt to do them if it meant do that or lose his job.

He's working . . . back at the same job – or back at the same employer, different job there. He says the pain's constant. It's worse when he's working, and he tires quickly, doesn't have as much grip strength. The only hobby it interferes with basically is throwing a baseball to his boys. He's a baseball coach. He can't throw it as well, he said, as he could before. At the house he can't lift much. And when he has to use a screwdriver to screw something in he has to take breaks. It's painful. Can't use lawn mowers or weedeaters like he could before. The vibration causes him a lot of pain and hurts him. Takes a lot of Advil. And he's on a prescription of anti-inflammatory.

. . . Since his date of release he's missed no work because of this injury. Feels like he could continue to do the job that he's doing. . . . As the area manager testified . . . he had no complaint about the work performance of the plaintiff. . . .

But I believe that he does have a – a disability to his right arm. And if I didn't say this, the doctor gave him a three percent rating to his arm according to the AMA Guides, Dr. Weikert. And I feel like that he has a permanent partial vocational disability of 30 percent to his upper right extremity based on the statements I've made above and the fact that he does have continued pain, can't use certain vibratory tools, lawn mower, weedeater, can't lift as much as he could before. . . .

. . . But based upon all the evidence I've heard – and I do think he has some restrictions and because of that and the pain and the restrictions that I feel like he has based upon his testimony, I think he's entitled to 30 [percent] vocational disability. Thanks, y'all.

(App. 49-53.)

Nissan's counsel then asked the chancellor to elaborate on what restrictions he felt Jones had.

The court responded,

I think using – I think tools – like I stated – vibratory tools, lawn mower, weedeater, anything that would vibrate will cause his elbow to hurt. And I think lifting – he's testified to lifting and rolling motion of his arm kind of hurts him and throwing balls and stuff like that. I just think that those are legitimate. And that's what he testified to. Those are the only ones – and he has constant pain all the time as well. Has grip strength loss. I think that's about – I think I've covered most

4

> everything. I might have left something out. But I think those are the things that –
> that I feel like that he's lost as a result of this. And because of that I think his
> vocational disability is substantial, not as substantial maybe as the plaintiffs feel, but
> I feel like that it's something he's got to live with and deal with the rest of his life,
> and he should be entitled to [a] vocational disability rating of 30 percent.

(App. 53-54.)

Counsel for Nissan then drafted a written order, which Jones's counsel reviewed and the

court signed on June 20, 2006. It incorporated the chancellor's previously stated findings of fact and

conclusions of law (excerpted above) and also provided in part:

> Plaintiff retains a 3% permanent anatomical impairment to the right upper extremity.
> Based on this rating, his restrictions against working with power tools and against
> lifting, his ability to return to his pre-injury employer at or above his pre-injury wage
> rate, his education, his job skills, and his employability on the open labor market,
> Plaintiff retains a 30% permanent disability to the right arm. This entitled Plaintiff
> to XXXX weeks of benefits at the stipulated weekly rate of $ XXXX, all of which
> have accrued at the time of trial, and, therefore, are due and payable in a lump sum
> of $XXXX.
>
> . . . It is therefore, ORDERED, ADJUDGED, and DECREED that Plaintiff shall
> recover from Defendants:
>
> (1)     XXXX weeks of permanent disability benefits at the weekly rate of $ XXXX
> for lump sum of $ XXXX;
>
> (2)     future medical expenses pursuant to T.C.A. § 50-6-204; and
>
> (3)     reimbursement of discretionary costs totaling $280.00.

(App. 44.) (redaction in original.) Following the trial, Jones returned to his body-fits job.

5

The award of benefits was higher than Nissan was expecting.[1]  Nissan initially appealed, but later withdrew its appeal.  Jones and his counsel considered asking the court to change or clarify its ruling,[2] but did not request an amendment.[3]

Kitty Boyte, counsel for Nissan in the workers' compensation case, emailed the result of the trial to Nissan's legal department and to Miles Tate, a representative of Nissan's on-site third-party administrator for workers' compensation claims.[4]  Boyte's June 8, 2006, email summarized the court's decision as follows:

> In his Findings of Fact and Conclusions of Law, Chancellor Smith made a point of saying on the record that he found that Plaintiff was restricted . . . from lifting and using power tools.

(App. 28.)  On June 13, 2006, Boyte wrote an email to Ray Coss, Nissan's in-house counsel, and copied (among others) Kerry Dove, the department manager of safety and medical management for Nissan.  Boyte wrote in part,

---

[1]Ray Coss, Nissan's in-house counsel explained why the company thought the award was excessive: ". . . the judge imposed what we thought were unsubstantiated medical restrictions.  The judge basically was acting like a doctor, we felt, and gave substantial restrictions, and we think, gave a substantial – or under workers' comp law he's allowed to multiply the impairment rating by a certain factor.  And he applied a factor that usually corresponded with a no return to work." (Trial Tr. 346.)

[2]On cross-examination, Jones agreed that he had stated in a previous deposition that "the judge in the workers' compensation trial overstated the extent of [his] injury."  (Trial Tr. 543-44.)

[3]Jones's workers' compensation counsel did not testify at trial.  Jones testified that it was his understanding that Nissan had "dropped the appeal before we could have a chance" to ask for clarification.  (Trial Tr. 539.)

[4]Large portions of Boyte's email, and all other emails in the record, were redacted as work product.  (Trial Tr. 310.)

> But in his FoF/CoL [Findings of Fact/Conclusions of Law], Chancellor Smith commented that . . . (2) Plaintiff testified that he (Jones) did not feel that he was capable of performing any jobs that required use of power tools, had problems operating a screwdriver when performing tasks at home, and could not lift heavy objects without experiencing pain and weakness in his arm, (3) Only Plaintiff knew what he could and could not do safely and comfortably, and since he (Jones) felt that he was unable to perform those tasks, he ([Chancellor] Smith) felt that he was restricted from performing those types of tasks. When [Chancellor] Smith said, "I find him to be restricted, and therefore I find him to be 30% disabled[,"] and then asked if there were any other issues to be determined that he had not mentioned, I asked him what he meant by Plaintiff being restricted. He went back and said (again) that Plaintiff said he was unable to operate power tools and unable to lift, and that he (Jones) knew best about what he could and couldn't do safely and comfortably, and therefore he ([Chancellor] Smith) found him to be restricted from the use of power tools and from lifting.

(App. 25.) On June 14, 2006, Dove emailed Coss and others, stating in part,

> . . . If [Jones] feels he cannot perform those tasks without getting injured and the judge agrees, we need to honor that.
>
> It is my opinion that his restrictions should be *no lifting, no use of power tools, and no use of hand tools*. We should move on this ASAP and determine if he is working within those restrictions. I am truly concerned that if his job requires him to perform these tasks he may be in harm[']s way. Pat, please have Wade review his jobs ASAP to determine if he is exceeding these restrictions imposed by the judge and we will take action from there.

(App. 23.) (emphasis added.) Dove testified that when he wrote that email message, he had not yet read the court's oral ruling or written order.[5] He based his understanding of the court's ruling on Kitty's Boyte's email, notwithstanding that Boyte's email does not state that Jones was restricted in his use of hand tools on the job.

---

[5]Dove could not identify the transcript of the court's statements at trial, and testified that the first time he read the court order was when preparing to be deposed in this suit.

In response to Dove's email, Wade Pinkard, a job-placement coordinator for Whole Health

Management, an entity that provides health providers for the clinic at Nissan, replied on June 19,

2006,

> In Kitty's June 08 message she states Chancellor Smith found EE [employee] to be restricted from lifting and using power tools. In your June 14 message you opine [permanent] restrictions should be no lifting, no use of power tools, and no use of hand tools. *The no use of hand tools is very significant.*
>
> Should Dr. Kubina review and make recommendations regarding permanent restrictions?
>
> If permanent restrictions are imposed, the EE's medical file should be brought current, and the restrictions entered in KCRS.

(App. 22.) (brackets in original) (emphasis added.) That same day, Dove responded,

> Yes, please get Dr. Kubina's opinion and hers should be our official stance. I got that from the statement that he could not use a screwdriver, but I'm no doctor. Thanks!

(App. 22.) At trial, Dove conceded that Boyte's email had not said that Jones could not use a

screwdriver, but that he "had problems operating a screwdriver when performing tasks at home."

Dove testified that he consulted the legal department about how to get the restrictions into Jones's

medical record. Dove understood the issue to be a legal matter, not a medical one. Ray Coss,

Nissan's in-house counsel met with Dove. Coss interpreted the court's order as affirmatively

"order[ing Nissan] to impose medical restrictions on Mark Jones." Coss admitted that whatever the

chancellor said about restrictions was not a medical judgment, but testified that "in the context of

this workers' comp trial and order, we treated [] this as if it was a medical restriction." Specifically,

Coss read the court order as saying "no use of power tools, no lifting, and no use of hand tools."

Coss testified that he reached this conclusion by taking the court's oral ruling and its written order

8

together, and reading them "in totality." Coss conceded that the court's ruling did not specifically say anything about the use of hand tools, but stated that that finding was supported by the part of the judge's ruling which acknowledged that Jones would be unable to do the metal-line job (the job he had before the body trim fits job and the job in which he was injured), and that Jones had used hand tools in that job. Coss also testified that, although the court's order does not say that Jones is permanently restricted from all lifting, he interpreted the language in the court's written order referencing a "restriction[] . . . against lifting," to mean that Jones was not permitted to lift anything at all.

Coss testified that he informed Dr. Anne Kubina, onsite medical director for Nissan, of his interpretation of the court's order, and instructed her to place the permanent restrictions in Jones's medical file. Nissan did not ask Dr. Kubina for her medical opinion of Jones's ability to work; Dr. Kubina examined or even met Jones. Dr. Kubina testified that she had not read the court's order when she entered the restrictions. Dr. Kubina had been included in the email chain describing the court's order, however, and she stated that she trusted her sources. Dr. Kubina understood her role to be "documenting" the restrictions that the chancellor had already assigned. Accordingly, on July 18, 2006, Dr. Kubina made an entry in Jones's medical record stating that,

> EE was not seen in office, but a recent court ruling has caused him to have new permanent restrictions.
>
> . . . Per recent judicial ruling, EE now has the following permanent restrictions: no lifting, no use of power tools, and no use of hand tools.

(App. 41.) Dr. Kubina conceded that she "had no idea about how the restrictions that [she] put in th[e] medical record match[ed] up to Mark Jones' actual medical condition."

9

After the restrictions were documented, Nissan evaluated whether it had any jobs Jones could perform within the restrictions. Finding none, Nissan informed Jones on July 25, 2006, that he was immediately being placed on a medical leave of absence.[6] Nissan told Jones that it had placed him on leave because he had permanent restrictions and it was unable to find a job for him within those restrictions. A few days later, Jones returned for a "leave information meeting," during which he was asked to sign a form indicating he was restricted from lifting, using power tools, and using hand

---

[6]Nissan's in-house counsel, Coss, testified that the decision to drop Nissan's appeal in Jones's workers' compensation case occurred the same day. Jones contends that Nissan dropped its appeal then so that the permanent restrictions that Jones learned about that day would be instantly final. Jones argues that Nissan was concerned that while the appeal was still pending, Jones's counsel could have gone back to the workers' compensation court, and had the court specify that it did not mean to assign permanent restrictions, thereby undermining the permanent restrictions Nissan had just imposed.

An exchange between Coss and Jones's counsel supports this understanding:

Q: Appeal[ing] . . . the [chancellor's] decision would mean and Nissan believed that appealing the judge's decision would mean that the workers' compensation case was not final, right?
A: Yes.
Q: Okay. Nissan felt that if the workers' comp case was not final, then that could impact if the permanent restrictions remained or not, correct?
A: Yes.
Q: If Nissan continued the appeal, Nissan felt that Mark Jones' workers' compensation attorney might try to get the permanent restrictions lifted, correct?
A: We expected them to do that.
Q: You considered that possibility and you decided to drop the appeal, right?
A: Yes.

(Trial Tr. 342.) However, Coss later stated that preventing Jones's counsel from doing anything about the restrictions "wasn't a consideration" in deciding whether to drop the appeal. (Trial Tr. 353.)

tools. Jones refused to sign the form, explaining "I was not on any restrictions, I could do my job, and I was able to do my job." Jones was encouraged to apply for long-term disability, but did not.

After being placed on medical leave, Jones repeatedly contacted Nissan requesting unsuccessfully to have the restrictions lifted and to be allowed to return to his job. According to Nissan, there were no jobs available during that time that met Jones's restrictions. As of the start date of his medical leave on July 25, 2006, Jones no longer received a paycheck from Nissan, though the company did pay a portion of his health insurance premiums. On October 14, 2007, citing the need to provide for his family, Jones took a job as a fleet manager with American Residential Services that paid him $13 per hour ($15 per hour by the time of trial).

Nissan policy prevents employees on leave to work without obtaining advance approval. Jones testified at trial that he did not seek Nissan's permission to work because "I knew what their view was going to be. What job could I work with no lifting, no use of power tools, and no hand tools, with me being a laborer? I knew I wasn't going to be able to find something with them okaying it, . . ." Nissan learned about Jones's new job in January 2008 during his deposition. Nissan's human resources department recommended that Jones's employment be terminated, and Jones was fired on January 22, 2008.

Jones filed suit in federal court alleging discrimination under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, and what is now the Tennessee Disability Act (TDA), Tenn. Code Ann. § 8-50-103. Following discovery, both Jones and Nissan filed motions for summary judgment, which the district court denied. At the jury trial held from April 21 to 24, 2009, only Jones presented a case-in-chief; Nissan did not present other witnesses. At the conclusion of Jones's case, both

parties made oral motions for judgment as a matter of law (JMOL), and responded to the other side's

motion. The court denied both motions in an oral ruling and denied the parties' objections to the

proposed jury instructions. The jury returned a verdict for Nissan.[7]

On May 8, 2009, Jones filed a motion for JMOL, or alternatively, a new trial. The district

court denied the motion in a June 24, 2009, memorandum and order. The court rejected Jones's

"certitude that Nissan perceived or regarded him as disabled and because of such misperception

wrongfully placed him on a medical leave of absence" and concluded that "based upon the evidence

presented, a jury could (and presumably did) conclude that Nissan was acting in accordance with its

interpretation that the Chancery Court Order placed certain restrictions on Jones and precluded him

from working on the assembly line, as well as in certain other jobs at Nissan." Jones timely

appealed.

### DISCUSSION

I.      "Regarded As" Disability Discrimination Claim

    A.      Standard of Review

We review *de novo* the denial of a Rule 50(b) motion for judgment as a matter of law. *See*

*Morgan v. New York Life Ins. Co.*, 559 F.3d 425, 434 (6th Cir. 2009.) "In entertaining a motion for

judgment as a matter of law, the court is to review all evidence and draw all reasonable inferences

in the light most favorable to the non-moving party, without making credibility determinations or

---

[7]The jury was asked whether Jones had proved by a preponderance of the evidence that he was discriminated against in violation of his rights under the ADA, and the same question with regard to the TDA. The jury answered no to both questions.

weighing the evidence." *Jackson v. FedEx Corporate Servs., Inc.*, 518 F.3d 388, 392 (6th Cir. 2008) (citations omitted). Judgment as a matter of law becomes appropriate when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed. R. Civ. P. 50(a)(1). Rule 50(b) motions may be based upon a challenge to the facts as found by the jury or upon purely legal grounds. *See K & T Enters., Inc. v. Zurich Ins. Co.*, 97 F.3d 171, 175 (6th Cir. 1996).

Denial of a Rule 59 motion for a new trial is reviewed for abuse of discretion. *See Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 323 (6th Cir. 2007). We have interpreted Rule 59 to mean that a new trial is required only when "a jury has reached a seriously erroneous result as evidenced by [] (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, *i.e.*, the proceedings being influenced by prejudice or bias." *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 405 (6th Cir 2006) (citation and internal quotation marks omitted). If a reasonable juror could have reached the challenged verdict, "a new trial is improper." *Taylor v. TECO Barge Line, Inc.*, 517 F.3d 372 (6th Cir. 2008) (citation and internal quotation marks omitted). "[C]ourts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." *Barnes v. Owens-Corning Fiberglas Corp.*, 201 F.3d 815, 821 (6th Cir. 2000) (citation and internal quotation marks omitted).

B.       Relevant Disability Law

Under the ADA, "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).[8] In order to "recover on a claim of discrimination under the [ADA], a plaintiff must show that: 1) he is an individual with a disability; 2) he is 'otherwise qualified' to perform the job requirements, with or without reasonable accommodation; and 3) he was discharged solely by reason of his handicap." *Macy v. Hopkins Cnty. Sch. Bd. of Educ.*, 484 F.3d 357, 363 (6th Cir. 2007).

The first step is determining whether the plaintiff has a disability. *See Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1185 (6th Cir. 1996). In this regard, the ADA provides:

> (2) Disability
> "The term "disability" means, with respect to an individual--
> (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
> (B) a record of such an impairment; or
> (C) *being regarded as having such an impairment*.

---

[8]The TDA provides, "There shall be no discrimination in the hiring, firing, and other terms and conditions of employment of . . . any private employer . . . based solely upon any physical, mental or visual disability of the applicant, . . ." Tenn. Code Ann. § 8-50-103(b). The elements of the TDA and the ADA are "very similar," thus, a claim brought under the TDA is analyzed "under the same principles as those utilized for the [ADA]." *See Bennett v. Nissan North America, Inc.*, 2009 WL 837726 at *7 (Tenn. Ct. App. 2009) (unpublished); *Sasser v. Quebecor Printing (USA) Corp.*, 159 S.W.3d 579, 584 (Tenn. Ct. App. 2004).

42 U.S.C.§ 12102 (2008) (emphasis added).[9] In this case, Jones claims he falls under§ 12102(2)(C) – that is, he claims not that he actually was disabled, but that he was so regarded by Nissan.[10] "It is not enough that the employer regarded that individual as somehow disabled; rather, the plaintiff must show that the employer regarded the individual as disabled within the meaning of the ADA." *Ross v. Campbell Soup Co.*, 237 F.3d 701, 709 (6th Cir. 2001) (citations and quotations omitted). Combining the requirements of subsections (A) and (C) of § 12102, Jones must show that Nissan regarded him as having a physical or mental impairment that substantially limits one or more of his major life activities. As the Supreme Court explained,

> There are two apparent ways in which individuals may fall within this statutory definition: (1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities. In both cases, it is necessary that a covered entity entertain misperceptions about the individual – it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting.

*Sutton v. United Air Lines*, 527 U.S. 471, 489 (1999), *superseded by statute on other grounds, see* n.9. Jones argues that he falls in the second category, that he had a physical impairment that did not substantially limit him in a major life activity.

---

[9]In 2008, the ADA was modified by the Americans with Disabilities Act Amendment Act ("ADAAA"), Pub. L. No. 110-325, 122 Stat. 3553. The ADAAA broadened the definition of disability in § 12102. However, this court has determined that the ADAAA does not apply to pre-amendment conduct, making it inapplicable to this case. *See Milholland v. Sumner Cnty. Bd. of Educ.*, 569 F.3d 562, 567 (6th Cir. 2009).

[10] Tennessee has an equivalent "regarded as" provision. *See* Tenn. Code Ann. § 4-21-102(3)(A)(iii).

No. 09-5786
*Jones v. Nissan North America, Inc.*

The relevant major life activities in this case are lifting and "performing manual tasks," a category that this court has found includes the use of hand tools, vibrating power tools, etc. *See Wysong v. Dow Chemical Co.*, 503 F.3d 441, 450 (6th Cir. 2007) (lifting a major life activity); *Kiphart v. Saturn Corp.*, 251 F.3d 573, 584 (6th Cir. 2001) (ability to perform manual tasks (including using "hand power tools" and "air vibrating power tools") a major life activity). In order for Jones to be "substantially limited," he would have to be:

> (i) Unable to perform a major life activity that the average person in the general population can perform; or (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

*Wysong*, 503 F.3d at 450 (citing 29 C.F.R. § 1630.2(j)(i)).[11]

With respect to "regarded as" discrimination, this court explained in *Holiday v. City of Chattanooga*, 206 F.3d 637 (6th Cir. 2000), that an employer is required to conduct an "individualized inquiry" into the plaintiff's *actual medical condition*:

> The ADA mandates an individualized inquiry in determining whether an employee's disability or other condition disqualifies him from a particular position. In order to properly evaluate a job applicant on the basis of his personal characteristics, the employer must conduct an individualized inquiry into the individual's actual medical condition, and the impact, if any, the condition might have on that individual's ability to perform the job in question.

*Id.* at 643.

---

[11] Alternatively, the major life activity of "working" may be at issue here. The definition for "substantially limits" specific to working is: "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." *Wysong*, 503 F.3d at 451 (6th Cir. 2007) (citing 29 C.F.R. § 1630.2(j)(3)(i)).

16

No. 09-5786
*Jones v. Nissan North America, Inc.*

C.       The Parties' Positions

Jones argues that the undisputed material facts establish that Nissan regarded him as having a substantially-limiting impairment that he did not have. Jones maintains that he did not actually have the physical limitations Nissan placed in his medical record, citing in support that he had been satisfactorily performing all the physical tasks associated with his job until he was removed, that no doctor ever assigned him any restrictions, that he did not testify at the workers' compensation hearing that he could not lift at all or use any power or hand tools at all, that the chancellor's order referenced his "ability to return to his pre-injury employer," that the chancellor was not qualified to impose medical restrictions, and that even Nissan thought that the restrictions it contends the chancellor imposed were "completely unsubstantiated."[12]

Jones contends that Nissan's interpretation of the chancellor's ruling is not a legally sufficient evidentiary basis upon which a jury could rely because Nissan relied on unsubstantiated restrictions, and did not conduct an individualized inquiry into Jones's actual medical condition as required by *Holiday*, 206 F.3d at 643. He argues that Nissan's "interpretation" of the chancellor's order was incorrect as a matter of law because 1) the chancellor did not affirmatively order Nissan to do anything other than pay workers' compensation benefits, 2) the order did not state that Jones was restricted from all lifting or using hand tools (the order did not even include the words "hand tools"), and 3) the order never stated that Jones was unable to do his job.

---

[12]The "completely unsubstantiated" label comes from the testimony of Ray Coss, Nissan's in-house counsel, explaining why the company thought the workers' compensation award was excessive.

17

Nissan does not dispute Jones's arguments about his actual medical condition, but counters that it could not have "disregarded a court order," and that its imposition of workplace restrictions was merely an attempt to comply with the chancellor's ruling. Nissan argues that it did not treat Jones as if his elbow injury were substantially limiting, as evidenced by the fact that Nissan returned Jones to work after Jones returned from the injury in January 2005 and only placed him on leave after the Chancery Court issued its June 2006 order. Nissan stresses that its employees did not harbor any myths, fears, or stereotypes about Jones's medical condition, nor did they even consider the chancellor's order to be a medical judgment, thereby positioning this case outside the realm of regarded-as discrimination cases. Nissan insists that this is not a disability-discrimination case because Nissan did not believe that Jones was unable to do the job. Rather, it believed that the chancellor had declared Nissan could not permit Jones to do his job.[13]

Nissan responds to Jones's argument that the chancellor's ruling is not a legally sufficient evidentiary basis for the jury's verdict by citing various cases for the proposition that court orders

---

[13]At one point, in the string of e-mails, Dove wrote:

> *It is my opinion that his restrictions should be no lifting, no use of power tools, and no use of hand tools.* We should move on this ASAP and determine if he is working within those restrictions. I am truly concerned that if his job requires him to perform these tasks he may be in harm[']s way. Pat, please have Wade review his jobs ASAP to determine if he is exceeding these restrictions imposed by the judge and we will take action from there.

The implication here is that Dove was actually concerned about Jones's safety, i.e., that he thought he was actually disabled from the position. Nissan has retreated from that position and has defended the case on the basis that it did not believe Jones was, in fact, disabled from the position, and was simply relying on its interpretation of the chancellor's order.

must be complied with promptly. Concerning its interpretation of the order, Nissan argues that so

long as its actions were based on an "honest belief" rather than discriminatory animus, it did not

discriminate. Finally, Nissan argues that this court should not make any determinations about the

chancellor's order as a matter of law because in the disability-discrimination context, the order is

relevant only as the basis for Nissan's actions, and a jury is entitled to decide whether it provides a

valid, non-discriminatory reason.

> The court instructed the jury, consistent with Nissan's position:

> All persons who are subject to an order of a court have an obligation to comply and
> to follow the court's order. A person subject to a court order may not ignore or
> violate that order.
> . . . .
> [] "if you find that Defendant honestly believed it was acting as required by
> Chancellor Smith's ruling and that it honestly believed that because of the ruling
> Plaintiff could not perform the essential functions of an available job at Nissan, then
> you may not conclude that Defendant acted for a discriminatory reason.

(Trial Tr. 657.)

## D. Analysis

This is an atypical regarded-as discrimination case in that the purported source of the physical

restrictions Nissan imposed on Jones was a state-court order rather than Nissan's own conclusions

about Jones's capabilities. Thus, this case turns on the legitimacy of Nissan's interpretation of the

court order to impose ability restrictions on Jones and whether Nissan had an independent obligation

to ascertain Jones's medical condition and capabilities.

### 1. Jones was entitled to Judgment as a Matter of Law

The central issue is the legitimacy of the nondiscriminatory reason offered by Nissan for its actions – that it relied on the order of the workers' compensation chancellor. This defense fails as a matter of law because 1) as a matter of law and fact, the order did not require that Nissan take the actions it took; 2) there was no genuine issue whether Nissan independently assessed Jones's physical capabilities; and, 3) there was no genuine issue whether Nissan made the reasonable assessment and inquiry required to assert an honest-belief defense.

a. The order did not require that Nissan impose medical restrictions on Jones

Nissan's defense, and the district court's denial of Jones's post-trial motions, was based on the premise that Nissan imposed unsubstantiated medical restrictions on Jones because it believed the chancellor's decision and order required it to do so. We will assume arguendo that if an employer is ordered by a court to impose restrictions on an employee's work activities, the employer cannot be found to have violated the ADA simply by obeying the court's order, the theory being that the employer has imposed the restrictions without regard to its perception of the employee's physical disabilities, and in compliance with the court order. Or, stated differently, the employer's view of the employee's disability is not the cause of the restrictions because the employer was obliged to impose the restriction in any event due to the court order.

In the instant case, however, notwithstanding Nissan's arguments to the contrary, it is clear beyond peradventure that the chancellor's order did not direct Nissan to restrict Jones from continuing in the trim-fit position he was performing at the time of the workers' compensation trial. The order only directs Nissan to pay certain benefits.

Further, even if, as Nissan argues, the findings of the workers' compensation chancellor could amount to an order to impose restrictions, Nissan employees continually revised the chancellor's findings without regard to what the chancellor actually stated. Most glaringly, Nissan concluded that Jones was restricted from using "hand tools," despite the fact that the chancellor did not make a single finding with regard to Jones's ability to use hand tools in his job.

Thus, it cannot fairly be said that Nissan imposed the medical restrictions in compliance with the court order. At best, Nissan imposed the restrictions based on its conclusion that the order required it to do so.

b. There was no genuine issue whether Nissan conducted an individualized inquiry.

The law is clear that an employer cannot simply rely on a third-party's assessment that an employee is disabled. *Holiday*, 206 F.3d at 643, explains that an employer is required to conduct an "individualized inquiry" into the plaintiff's *actual medical condition*. The record reflects a complete lack of evidence that Nissan took any steps to ascertain Jones's actual medical condition. In fact, Nissan acknowledged that it conducted no such inquiry because it determined that it did not matter whether Jones was medically disabled. Nissan's own physician never saw Jones or even evaluated his medical file and instead placed medical limitations on Jones citing a "recent judicial ruling." Coss admitted that whatever the chancellor said about restrictions was not a medical judgment "in the classical sense," but stated that nevertheless, "in the context of this workers' comp trial and order, we treated [] this as if it was a medical restriction."

Nissan argues that it did not have to inquire into Jones's true medical condition because it did not base its decision on whether it regarded Jones as medically unable to perform his job functions

21

but, rather, on its honest belief regarding the meaning of the chancellor's order. Nissan insists that it did not regard Jones as disabled and believed he could do the job, as evidenced by the fact that it let him perform his job until the chancellor's decision. But that is irrelevant; Jones does not claim he was regarded as disabled before the chancellor's decision. He claims that as a result of the chancellor's decision, Nissan regarded him as unable to perform his job. Nissan responds that after the chancellor's decision it still believed Jones was able to perform his job, but also believed it was required to impose medical restrictions consistent with the chancellor's findings. Coss acknowledged that he treated the chancellor's findings as medical restrictions and directed that the restrictions be placed in Jones's file.

Thus, Nissan attempts to draw a distinction between misperceptions of an employee's medical condition and misperception of his legal status. We reject that effort in the context of this case. Here the misperception motivating Nissan was that the chancellor concluded that Jones could not use hand tools and could do no lifting at all. It is clear that had a doctor used the same words as the chancellor used, Nissan would have been obligated to look beyond its perception of the doctor's conclusions and make an individualized assessment of Jones's abilities. *See Holiday*, 206 F.3d at 643-44, and cases cited therein.

The question then is whether when an employer takes action based on a third party's judgment regarding the employee's physical ability to perform the job, it is excused from making an individualized inquiry if it perceives that it is required to follow the third party's judgment without regard to the accuracy of that judgment. Nissan argues that in such a case the employer is not acting based on prejudice, myths or preconceived notions about an employee's physical abilities, but rather

on its understanding, albeit possibly mistaken, of its obligations separate and apart from its perceptions of the employee's physical capabilities. Nissan thus seeks refuge behind the chancellor's conclusions by casting them as legal, rather than medical, conclusions. But the chancellor's statements were neither; they were findings in support of the chancellor's ruling. In making these findings, the chancellor did not impose restrictions on Jones; the chancellor simply stated, in response to Nissan's counsel's request for clarification, what the chancellor found to be the injury's effect on Jones's ability to perform various tasks. Whether this is labeled as a medical determination or some other type of determination, this determination concerns Jones's physical ability to perform his job. Were employers permitted to infer an inability to do the job based on workers' compensation findings of fact, the purposes of the ADA would be undermined. Although Nissan disavows sharing the chancellor's view of Jones's limitations, it nevertheless drew unfounded inferences from those findings, leading it to impose unsupported medical restrictions on Jones. This constitutes discrimination under the ADA. Although the basis for the judgment may have been the chancellor's ruling, it is undisputed that Nissan regarded Jones as having physical/medical restrictions rendering him unable to perform his job.

c. There was no genuine issue whether Nissan is entitled to the honest-belief defense.

Nissan has consistently defended this action on the basis that it honestly believed that it was required to impose restrictions by the chancellor's order. The district court rejected Jones's post-trial motion on the basis that the jury reasonably concluded that Nissan did not regard Jones as disabled

but honestly believed it was required to impose the disqualifying medical restrictions based on the chancellor's order. We therefore turn to the "honest belief" rule.[14]

The general rule provides that "so long as the employer honestly believed in the proffered reason for its employment action, the employee cannot establish pretext even if the employer's reason is ultimately found to be mistaken, foolish, trivial, or baseless." *Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1998). However, this circuit employs a modified honest-belief approach. *See Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 714 (6th Cir. 2007). In contrast to the "bare" honest-belief approach described above, in this circuit "the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made" in order to avoid the finding that its claimed nondiscriminatory reason was pretextual. *Id*. (applying approach to race discrimination retaliation claim); *see also Mickey v. Zeidler Tool & Die Co.*, 155 F.3d 799, 806-07 (6th Cir. 1998) (in the ADEA context), *Smith*, 155 F.3d at 806-07 (ADA). This Court has explained:

> In determining whether an employer "reasonably relied on the particularized facts then before it, we do not require that the decisional process used by the employer be optimal or that it left no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." [*Smith*, 155 F.3d at 807] (citing [*Texas Dep't of Cmty. Affairs v.*] *Burdine*, 450 U.S. [248, 256 (1981)]). Although we will not "micro-manage the process used by employers in making their employment

---

[14]As a preliminary matter, it is unclear whether a defendant is entitled to the benefit of the rule beyond the summary judgment stage of the proceedings. *See Clay v. United Parcel Serv., Inc.,* 501 F.3d 695, 714 (6th Cir. 2007) ("The honest-belief rule is, in effect, one last opportunity for the defendant to prevail on summary judgment."). *But see Weimer v. Honda of Am. Mfg. Inc.*, 356 F. App'x 812, 817-18 (6th Cir. 2009) (district court did not commit reversible error by instructing the jury on honest-belief rule in FMLA case).

> decisions," we also will not "blindly assume that an employer's description of its reasons is honest." *Id*. Therefore, "[w]hen the employee is able to produce sufficient evidence to establish that the employer failed to make a reasonably informed and considered decision before taking its adverse employment action, thereby making its decisional process 'unworthy of credence,' then any reliance placed by the employer in such a process cannot be said to be honestly held." *Id*. at 807-08.

*Wright v. Murray Guard, Inc*., 455 F.3d 702, 708 (6th Cir. 2006).

Nissan's reliance on its interpretation of the court order as affirmatively requiring it to impose the restrictions on Jones runs afoul of the honest-belief rule. Coss, Nissan's in-house counsel, testified that Nissan "did our best to try to understand [the order]," and described how he concluded after reading the findings of fact and conclusions of law "taken together and read in totality," that the court order affirmatively ordered Nissan to impose the restrictions. In closing argument, counsel for Nissan argued that Coss consulted with other lawyers, and was methodical and deliberate in his consideration of the order.

However, notwithstanding Coss's characterizations of his own and Nissan's efforts, there is no legally sufficient evidentiary basis to support that conclusion. All the evidence supports that Nissan did not engage in a reasonably informed and considered decision. Neither the court's oral ruling nor the written order directed Nissan to impose restrictions on Jones. Kerry Dove, the individual at Nissan who first articulated the "no lifting," "no use of power tools," and "no use of hand tools" restrictions, had not read the chancellor's order when he proposed the restrictions. Had Dove read the order before recommending restrictions for Jones, he would have realized that the order did not mention hand tools, nor even state that Jones was "having problems" using a screwdriver, the understanding on which he testified he based that restriction. The chancellor actually stated that when using a screwdriver at home

Jones had to take breaks, and it caused him pain; but the same opinion stated Jones had no trouble with the hand tools he uses in his job – a light rubber hammer and a chisel. There is absolutely nothing in the decision that can reasonably be understood as finding that Jones was unable to perform the trim fits job. Indeed, the opinion makes clear that while Jones would likely be unable to perform the job he was doing when he was injured, he was at the time of trial, successfully performing the trim fits job.

Nor was the significance of Jones's ability to use hand tools unnoticed by Nissan. Wade Pinkard, a job-placement coordinator questioned Dove's interpretation of Boyte's email, especially his conclusion that Jones could not use hand tools:

> In Kitty's June 08 message she states Chancellor Smith found EE to be restricted from lifting and using power tools. In your June 14 message you opine [permanent] restrictions should be no lifting, no use of power tools, and no use of hand tools. The no use of hand tools is very significant.

Dove responded that Pinkard should obtain Dr. Kubina's opinion and that her opinion should be the company's official stance. Nevertheless, despite his own uncertainty about his conclusions, Dove then went to the legal department to see how to get his restrictions into Jones's medical record, and met with Coss.

Coss interpreted the court's order as affirmatively 'order[ing Nissan] to impose medical restrictions on Mark Jones." But Coss's stated rationale for the restrictions of no lifting, no use of power tools, and no use of hand tools was no more rooted in evidence than Dove's. Coss conceded that the court's ruling did not specifically say anything about the use of hand tools, but testified that his conclusion was supported by the part of the judge's ruling that acknowledged that Jones was having pain in his metal-line job, and that Jones had used hand tools in that job. Coss's conclusion

26

is not the result of reasonable reliance on particularized facts. The metal-line job was Jones's position when he was injured, not the job Jones was performing at the time Coss was determining restrictions. Nor did the opinion state anything about hand tools in Jones's old metal-line job. The opinion states that Jones probably could not do the metal-line job again because it "required a lot of lifting and more use of *vibratory* tools." (emphasis added).

Coss also testified that, though the court's order does not say that Jones is permanently restricted from all lifting, he interpreted the language in the chancellor's written order (drafted by Nissan's own attorney) referencing a "restriction[] . . . against lifting," to mean that Jones was not permitted to lift anything at all. There is simply no reason for Nissan to interpret the phrasing it selected in this narrow way. The chancellor had stated that Jones "can't lift as much as he could before," but also distinguished the job that Jones could no longer do – "the job he was doing at the time of his injury," which "required a lot of lifting and more use of vibratory tools" – from the job he was doing at the time of the workers' compensation trial – "Right now all he has to use is a hammer and a chisel. . . . But it's very . . . light type use of a hammer and a chisel. . . . and it doesn't require any heavy lifting, maybe sometime a hood, . . . it's very light . . . they're not very difficult to raise." Further, Dr. Weikert, Jones's Nissan-chosen physician, had released him back to work with *no* restrictions, lifting or otherwise.

Also strikingly contradictory to Nissan's interpretation of the chancellor's ruling and order is the statement in the order, drafted by Nissan's workers' compensation counsel, stating that the workers' compensation award is based on several factors, including Jones's "ability to return to his pre-injury employer at or above his pre-injury wage rate."

27

No reasonable jury could conclude that Nissan had an honest belief based on a "reasonably informed and considered decision" that the chancellor had ordered Nissan to impose restrictions on Jones such that he could no longer do the job the chancellor found he was able to do and assumed he would continue doing.

For the foregoing reasons, we conclude that the district court erred in denying Jones's motion for judgment as a matter of law and remand for a determination/new trial limited to the issue of damages.[15]

---

[15]Although our decision that Jones is entitled to judgment as a matter of law renders it unnecessary to reach most of his additional arguments, we nevertheless observe that for the reasons set forth above, the verdict and judgment were against the great weight of the evidence, and were Jones not entitled to a JMOL, he would clearly be entitled to a new trial.

Further, the Court's instructions did not fairly present the issue to the jury. The district court instructed the jury that it was obliged to find in Nissan's favor if it concluded that Nissan honestly believed it was acting as required by the chancellor's ruling and honestly believed that because of that ruling Jones could not perform the essential functions of his job, but refused to give Jones's requested instruction, explaining that an honest belief is one made after a "reasonably informed and considered decision." Thus, that the jury was instructed on the honest-belief rule and ultimately found for Nissan does imply a legitimate conclusion that Nissan is entitled to the benefit of the rule. The jury's verdict did not contain any particularized finding and the district court's instructions improperly characterized the rule, completely omitting the important reasonable-reliance-on-particularized-facts requirement that applies in this circuit and ignoring that "[w]hen the employee is able to produce sufficient evidence to establish that the employer failed to make a reasonably informed and considered decision before taking its adverse employment action, thereby making its decisional process 'unworthy of credence,' then any reliance placed by the employer in such a process cannot be said to be honestly held."

Moreover, this incomplete instruction coupled with the instruction that "[a]ll persons who are subject to an order of a court have an obligation to comply and to follow the court's order" and "[a] person subject to a court order may not ignore or violate that order" allowed the jury to infer that the order indeed required Nissan to impose the medical restrictions. Jones objected to the instruction, arguing that because the order did not oblige Nissan to impose the restrictions the instruction would be prejudicial. The court accepted Nissan's argument that the true meaning of the

2.      Limitations-on-remedies instruction

Jones argues that the district court erred in instructing the jury regarding limiting damages based on his accepting other employment without seeking Nissan's permission. Jones argues that the jury instructions based upon *McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352 (1995), are prejudicial and should be excluded from any new trial on damages. In *McKennon*, the Supreme Court established the "after-acquired evidence" defense, which allows a defendant employer to show that an employee would have been terminated anyway had the employer known of wrongful conduct by the employee plaintiff. 513 U.S. at 362. If the defense applies, it generally bars the employee from obtaining front pay and reinstatement, and limits backpay. *See Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1168 (6th Cir. 1996).

In the instant case, the district court instructed the jury:

> As a general rule, back pay damages, if any, apply from the time Plaintiff suffered an adverse action until the date of your verdict. However, in this case . . . Defendant contends that regardless of any claimed disability or perception of disability, it would have made the decision to terminate Plaintiff on January 25, 2008, because of conduct the Defendant discovered after it placed Plaintiff on leave. Specifically -- specifically, Defendant claims that when it became aware of the Plaintiff working for another employer in violation of the Defendant's rule prohibiting unauthorized work while on leave without permission, Defendant would have made the decision to terminate Plaintiff's employment at that point in time.

---

order did not matter, only Nissan's understanding of the order. But, in this context, Jones was entitled to have the jury instructed that the order did not, in fact, require that Nissan impose medical restrictions. In the absence of such an instruction the jury was permitted to believe, based on Nissan's in-house attorney's testimony, that the order actually required that the medical restrictions be imposed. The meaning of the order was not a question of fact. Although Nissan's honest belief might have been had there been adequate evidence to create a genuine issue, surely the true legal significance of the order would be relevant to this issue, especially where Nissan's main actor and witness on this issue was a lawyer.

If Defendant proves by a preponderance of the evidence that it would have made the same decision and would have terminated Plaintiff on January 25, 2008, because it discovered Plaintiff was working while on leave, you must limit an award of back pay from the time Plaintiff was placed on leave until January 25, 2008.

Next, front pay damages under ADA and TDA.

Damages also may be awarded on the ADA and the TDA for what is called front pay. An[] award of front pay compensates Plaintiff for the loss of future wages and employment benefits that have been caused by the Defendant's discriminatory conduct. The purpose of front pay is to restore Plaintiff to the position he would have been in absent the discrimination.

Therefore, if you find the Defendant would have terminated Plaintiff on January 25, 2008, after it discovered Plaintiff was working while on leave in violation of company policy, you may not award front pay damages. If, however, you decide that Defendant has not proven that it would have terminated Plaintiff on January 25, 2008, then you should consider the issue of front pay.

(Trial Tr. 661-62.)

Jones contends that *McKennon* does not apply in this case because his alleged wrongdoing occurred after Nissan's adverse action, and only occurred because of it. He stresses that Nissan's own improper conduct was the necessary precursor to his being forced to find other employment. Nissan counters that *McKennon* states that it applies even where the employer does not find out about the wrongdoing until (as here) engaging in discovery in a subsequent action by the plaintiff employee for discrimination.

Nissan's argument does not address the main issue here. It is clear under *McKennon* that the plaintiff employee is not excused by the fact that the defendant employer did not *find out* about the employee's wrongdoing until well after the fact. What is not clear is if *McKennon* applies to an employee's wrongdoing that *did not occur* until after some sort of adverse action was already

30

taken by the employer against the plaintiff employee. Although it appears to be an issue of first impression in this circuit, several courts have addressed, and sharply divided on, whether *McKennon*'s rule applies to *post-termination* wrongdoing. *See McKenna v. City of Philadelphia*, 636 F. Supp. 2d 446, 459 & n.4 (E.D. Pa. 2009) (collecting cases). Two circuit courts have concluded that post-employment misconduct *could* be the basis for applying *McKennon*'s after-acquired evidence defense. *See Sellers v. Mineta*, 358 F.3d 1058, 1064 (8th Cir. 2004) ("an employee's post-termination conduct can, in some circumstances, limit an employee's remedies for a wrongful discharge"); *Medlock v. Ortho Biotech*, *Inc.*, 164 F.3d 545, 555 (10th Cir.), *cert. denied*, 528 U.S. 813 (1999) (acknowledging "the possibility that in appropriate circumstances the logic of *McKennon* may permit certain limitations on relief based on post-termination conduct" but affirming district court's refusal to give *McKennon* instruction where alleged misconduct arose "as a direct result of retaliatory termination"); *see also McKenna*, 636 F. Supp. 2d at 461 (*McKennon*'s holding "that a plaintiff's pre-termination misconduct must be considered in evaluating equitable damages" should be extended to post-termination conduct); *Cohen v. Gulfstream Training Acad., Inc.*, 2008 WL 961472 at *3 (S.D. Fla. 2008) (unpublished) (noting that the post-termination conduct "directly flows from the conduct that occurred pre-termination"). Other courts have concluded that, because *McKennon* was premised on an employee-employer relationship, any misconduct occurring outside that relationship falls outside of the reach of the rule. *See, e.g.*, *Sigmon v. Parker Chapin Flattau & Klimpl*, 901 F. Supp. 667, 682-83 (S.D.N.Y. 1995); *Ryder v. Westinghouse Elec. Corp.*, 879 F. Supp. 534, 537-38 (W.D. Pa. 1995); *Carr v. Woodbury Cnty. Juv. Det. Ctr.*, 905 F. Supp. 619, 627-28 (N.D. Iowa 1995).

Complicating matters somewhat, Jones's wrongful conduct does not fit neatly into the post-termination category. Although his violation of Nissan's procedures did occur after Nissan's wrongful discrimination against him, Jones was on medical leave and still an employee at the time. Accordingly, the logic of the cases refusing to apply the *McKennon* rule because of a lack of employment relationship do not apply. However, cases like *Medlock* and *McKenna* which allow that the *McKennon* rule might be applicable, but counsel against applying it to limit recovery where the misconduct can be attributable to the defendant's prior illegal action are relevant. *See Medlock*, 164 F.3d at 555 (affirming refusal to give *McKennon* instruction where alleged misconduct arose "as a direct result of retaliatory discrimination");[16] *McKenna*, 636 F. Supp. 2d at 462 ("a plaintiff's post-termination wrongdoing must not be attributable to the defendant's conduct").[17]

Jones testified that he applied for other jobs without permission because he did not receive a paycheck while on medical leave from Nissan, and he needed to support his family. He also

[16]In *Medlock*, the plaintiff "touched and cursed at Defendant's counsel" at his unemployment compensation benefits hearing. In determining that the "necessary balancing of equities" cut against a *McKennon* instruction, the court noted, "It is not difficult to envision a defendant goading a former employee into losing her temper, only to claim later that certain forms of relief should be unavailable because it would have discharged the plaintiff based on her inability to control her temper." 164 F.3d at 555.

[17] The *McKenna* court found that the plaintiff's use of marijuana and his resulting conviction were sufficiently causally related to the defendant city's discrimination that it would be inequitable to restrict the plaintiff's back pay as a result of the conviction. As the court put it, "[h]ad [the plaintiff] not been wrongfully terminated, he would have continued to have been employed by the Philadelphia police department and would have had the insurance and the salary to treat his depression." The plaintiff had argued that he had never used marijuana until after his firing, and attributed it to the exacerbation of his depression, which he had had to stop treating because he had no medical insurance after being fired. *See McKenna*, 636 F. Supp. 2d at 463.

testified that he did not seek prior authorization from Nissan because he already knew what Nissan's answer would be.[18] The level of causation in this case is comparable to *Medlock*, and less attenuated than in *McKenna*. Were it not for Nissan's wrongful imposition of medical restrictions rendering Jones medically unfit for any position at Nissan, Jones would not have been in the position of seeking employment without Nissan's permission, in violation of its rules. Without Nissan's wrongful conduct, Jones would not have violated any rule. We therefore conclude that it was error to give the *McKennon* instruction limiting damages.[19]

## CONCLUSION

Accordingly, we **REVERSE**, direct the district court to enter judgment in Jones's favor, and **REMAND** for a determination/new trial on the issue of damages.

---

[18]Jones testified that he did not seek permission from Nissan to accept a position with American Residential Services because "I knew what their view was going to be. What job could I work with no lifting, no use of power tools, and no hand tools, with me being a laborer? I knew I wasn't going to be able to find something with them okaying it . . ."

[19]Although Jones made these arguments in his objections to the jury instructions, the district court rejected them without explanation. (Trial Tr. 471-76, 595.)